10:30:51

1                     UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF NEW YORK

3

4     - - - - - - - - - - - - - X
      UNITED STATES OF AMERICA     )      23MR566
5                                  )
      vs.
6                                        Rochester, New York
      MICHAEL RONCONE,           )   December 21, 2023
7                  Defendants.        10:30 a.m.
      - - - - - - - - - - - - - X
8     **DETENTION HEARING**

9

10                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE ELIZABETH A. WOLFORD
11                 UNITED STATES DISTRICT JUDGE

12

13                   TRINI E. ROSS, ESQ.
                     United States Attorney
                     BY: NICHOLAS COOPER,, ESQ.
14                       CASEY CHALBECK, ESQ.
                     Assistant United States Attorneys
15                   138 Delaware Avenue
                     Buffalo, New York 14202
16
                     PAUL G. DELL, ESQ.
17                   Law Office of Paul G. Dell
                     70 Niagara Street
18                   Buffalo, NY 14202

19
                     SARAH WHITCOMB, USPO
20

21

22

23

24    **COURT REPORTER: Karen J. Clark, Official Court Reporter**
                     **Karenclark1013@AOL.com**
25                   **100 State Street**
                     **Rochester, New York 14614**

```
 1                    USA V. M. RONCONE

 2

                    P R O C E E D I N G
 3              *              *              *

 4

 5              THE CLERK:  We're on the record in the

 6    matter of the United States versus Roncone, 23MR566.

 7              THE COURT:  All right.  Good morning,

 8    everybody.  Let's have appearances for the record.

 9              On behalf of the government?

10              MR. COOPER:  Good morning, your Honor.  For

11    the United States, Nicholas Cooper and paralegal Karen

12    Champoux.

13              MR. DELL:  Good morning, your Honor.  Paul

14    Dell for Mr. Roncone.

15              THE COURT:  Good morning.  What is your

16    first name, Michael?

17              THE DEFENDANT:  Michael.

18              THE COURT:  Michael Roncone?

19              THE DEFENDANT:  Yes, your Honor.

20              THE COURT:  My name is Judge Wolford and

21    I've been assigned to your case.  And you are

22    represented by Mr. Dell?

23              THE DEFENDANT:  Yes.

24              THE COURT:  And we have Officer Whitcomb and

25    Officer Nenni from Probation.
```

```
 1                      USA V. M. RONCONE
 2            So this is an appeal from Judge Schroeder's
 3  release order in this case.  Well, I'll state on the
 4  record first what I've received and reviewed.  I have
 5  the Notice of Motion that was filed by the government at
 6  docket 1 in case No. 23MR566.  I've reviewed the
 7  Criminal Complaint that was filed at docket 1 in case
 8  No. 23MJ168.  I have the Pretrial Services Report that
 9  was prepared on December 14, 2023 by the probation
10  office.  And I've reviewed the transcripts of the
11  detention hearing before Judge Schroeder that occurred
12  on December 18, 2023, and that is filed at docket 6 in
13  case No. 23MJ168.  And I believe that is it.  So, Mr.
14  Cooper -- well, I should state on the record, I've also
15  been handed a binder that appears to be Government
16  exhibits, but I'll turn it over to Mr. Cooper, it's the
17  government's appeal.  You may proceed whenever you're
18  ready.
19            MR. COOPER:  Yes, Judge, thank you.  That
20  binder is a duplicate of a binder that was used in front
21  of Judge Schroeder and that was provided -- I believe
22  Mr. Dell actually had counsel standing in for him at
23  that appearance in front of Judge Schroeder.  And I
24  spoke with Mr. Dell before today's appearance, and he
25  has a copy of all of those exhibits that have been
```

```
                      USA V. M. RONCONE
 1

 2   handed up to your Honor.

 3              THE COURT:  You have a copy of all of the

 4   exhibits?

 5              MR. DELL:  Yes, I do.  As far as having

 6   stand in for me, that is because I had a jury

 7   deliberating in state court.

 8              MR. COOPER:  I certainly wasn't --

 9              MR. DELL:  I just wanted to clarify that.

10              MR. COOPER:  Okay.

11              THE COURT:  Go ahead.

12              MR. COOPER:  Yes, Judge.  The government

13   moved for detention under 3142(f)(1)(a), (f)(1)(E),

14   (f)(2)(A) and (f)(2)(B).  Where I would like to start,

15   Judge, is with the serious risk that this person will

16   flee.

17              The Bail Reform Act allows your Honor to

18   consider information that is outside of the four corners

19   of the Complaint.  And I would submit that there are

20   likely cases where there is not much outside of the four

21   corners of the Complaint, and there are other cases

22   where there is a large volume of information for the

23   Court to consider outside of what's currently charged.

24   It's the government's position that this is one of those

25   cases.  Specifically the serious risk that this
```

```
 1                    USA V. M. RONCONE
 2   defendant will flee does not arise, in my view, out of
 3   the 992(g)(3) that the defendant is charged with right
 4   now.  As the Court is well aware, it's not a presumption
 5   case, there is no statutory mandatory minimum associated
 6   with that offense.  The statutory maximum is 15 years.
 7   And the Guidelines for the defendant would be in the
 8   neighborhood of two to four years imprisonment.  And so
 9   the serious risk that the defendant will flee arises out
10   of something else entirely.
11             On December 7th, 2023, the FBI and Homeland
12   Security investigations executed search warrants at five
13   different locations simultaneously in Buffalo and
14   Wellsville, New York.  This defendant's residence, the
15   Rare Breed Motorcycle Club clubhouse in Buffalo, and the
16   Rare Breed Motorcycle Club property/clubhouse in
17   Wellsville were all searched simultaneously.
18             Separate and apart from what was recovered
19   during the execution of those search warrants, and we'll
20   cover that, I'd like to point out for the Court to focus
21   on what was contained in the attachment B of those
22   search warrants, because the attachment B is left when
23   the warrants are executed and they are in the possession
24   of the defendant.
25             THE COURT:  Let me make sure I'm following
```

```
 1                      USA V. M. RONCONE
 2   the government's argument.  Because the government
 3   executed search warrants and left the search warrant
 4   that disclosed in attachment B what the scope of its
 5   investigation was, all government conduct there, that
 6   means that the defendant is likely to flee?
 7               MR. COOPER:  You're following me exactly
 8   correctly, Judge, and so we're required in attachment B
 9   --
10               THE COURT:  Do you know of any case that has
11   ever recognized that because the government decides to
12   execute a search warrant and disclose before charges are
13   filed what the scope of its investigation is, that then
14   the Court would be proper to conclude that that
15   heightens the risk of flight on the part of the
16   defendant?
17               MR. COOPER:  Judge, I'm not relying on a
18   case, I don't have one.  What I'm asking you to do is
19   make a logical inference that when a person is aware
20   that they are being investigated for a much more serious
21   offense than the offense charged in the Complaint --
22               THE COURT:  Don't you think that would turn
23   the Bail Reform Act on its head?
24               MR. COOPER:  No I don't think that, Judge.
25               THE COURT:  All right.
```

```
                       USA V. M. RONCONE
```

1    USA V. M. RONCONE

2         MR. COOPER:  I think this is a pretty

3    unusual set of circumstances.

4         THE COURT:  It's an unusual set of

5    circumstances in the sense that the government has

6    charges that nobody is going to argue that possessing

7    firearms while being a marijuana user is a serious

8    offense, well, at least nobody reasonable would argue

9    that, so what is unusual here is the government is

10   seeking to expand, basically, the scope of what the

11   Court considers in determining whether or not to detain

12   somebody pretrial, and it's using its own steps in the

13   investigation to prove that.  I think that kind of loses

14   sight of what a Court is supposed to look at.  I don't

15   quarrel that there is case law out there that says you

16   can look beyond what the charges are.  Absolutely.  I

17   agree with you.  But I don't think there is a case like

18   this, Mr. Cooper, not one that I've looked at where

19   essentially the government is saying because we executed

20   a search warrant and then disclosed what we're looking

21   into, that means that there is really a significant

22   flight risk here.  I mean, I mean, under those

23   circumstances, the government would have control over

24   whether or not somebody is a potential flight risk any

25   time they disclose the scope of their investigation to

USA V. M. RONCONE

1
2  somebody.

3          MR. COOPER:  Judge, in instances where the
4  government is investigating the murder of a federal
5  witness, then those circumstances would exist.  I don't
6  understand.  Is the Court inferring that the government
7  would do that in bad faith to ask for somebody to be
8  detained?

9          THE COURT:  I'm not accusing anybody of bad
10  faith, Mr. Cooper.  All I'm suggesting is it seems to me
11  that you're turning the Bail Reform Act on its head
12  because what you're saying is because we executed a
13  search warrant and because we've disclosed the
14  investigation, that means this guy is a flight risk even
15  though we haven't charged him with any of these crimes.

16          MR. COOPER:  What I'm arguing to the Court,
17  and I understand if the Court disagrees, but what I'm
18  arguing to the Court is that the facts, as they exist
19  now, are that this defendant is aware of what was being
20  searched for in that residence and what it's related to
21  and that is a very serious offense, what it's related
22  to.  And because those are the facts, regardless, I
23  understand the Court's position, that is based on
24  government action, and we have to further our
25  investigation, and that means executing search warrants.

```
 1                    USA V. M. RONCONE
 2   And so it certainly wasn't designed to one day stand in
 3   front of your Honor and make this detention argument.
 4   That is not what happened.  We execute that search
 5   warrant because we investigate crimes, almost no greater
 6   crime than the murder of a federal witness.  When we
 7   execute that search warrant, law enforcement will leave
 8   that copy of the warrant, with attachment A and
 9   attachment B, and that is what they did.  All I'm
10   arguing to the Court is that now, the facts on the
11   ground as they exist, are that this defendant is aware
12   of that.  And so separate from, you know, the argument
13   that I make on a 841(b)(1)(A) case with a 924(c), I
14   argue to the Court all of the time, Judge, this person
15   is facing 15 years mandatory minimum time, that poses an
16   significant incentive to flee.
17                    THE COURT:  But there are charges filed.
18                    MR. COOPER:  And I recognize the distinction
19   between there being charges filed.  And in the --
20   generally when charges are filed is the first time a
21   person becomes aware they are under investigation.
22   Because this has played out where the warrant is
23   executed, we recovered things that day that we found
24   that are the basis of a Criminal Complaint, that
25   defendant is charged with a lesser offense, but I'm
```

```
 1                    USA V. M. RONCONE
 2   asking you to consider he now has knowledge of something
 3   that most defendants would not have knowledge until they
 4   were charged.  So the same incentive to flee or a
 5   similar incentive to flee once someone is charged also
 6   exists maybe to a slightly lesser extent when they are
 7   under investigation of an offense.  Certainly when they
 8   evince consciousness of guilt when involved.  For
 9   example, the President of the Rare Breed Wellsville
10   Motorcycle chapter, this defendant, closing down the
11   Wellsville Rare Breed chapter during the FBI's
12   investigation in Wellsville into the death of Crystal
13   Quinn.  Shutting it down.  It is covered in the meeting
14   minutes that were seized.
15                    THE COURT:  Tell me about that.
16                    MR. COOPER:  Absolutely, Judge.
17                    THE COURT:  Give me some facts about that,
18   Mr. Cooper.  Don't get testy about this.  I have to make
19   a decision as to whether or not to agree with the
20   government.  You have a very quizzical look on your
21   face.  I have to make a decision as to whether or not
22   with to agree with the government on this and detain
23   somebody pending a resolution of these charges even
24   though there is a presumption in favor of bail.  You
25   have to give me facts to support your argument, okay?
```

```
 1                        USA V. M. RONCONE
 2            MR. COOPER:  It is absolutely not my
 3   intention to be testy with the Court.  And if my face is
 4   weird looking, I apologize, I'm not trying to.
 5   Furthering my argument, but in no way am I intending to
 6   be disrespectful to your Honor.
 7            THE COURT:  Go ahead, Mr. Cooper.
 8            MR. COOPER:  Okay.  Thank you, Judge.
 9            So the Rare Breed Motorcycle Club in Buffalo
10   is where this defendant's current base of operations.
11            THE COURT:  And, well, I do need to
12   interrupt you.  There is a reference, I think, in the
13   Notice of Motion that you filed that he is the former
14   President of the Rare Breed Motorcycle Club's Wellsville
15   chapter.
16            MR. COOPER:  That's correct.  And I'm
17   working towards the explanation.
18            THE COURT:  Okay.
19            MR. COOPER:  So the Rare Breed clubhouse in
20   Buffalo is where the defendant was currently operating
21   out of when the search warrants were executed on
22   December 7th.
23            THE COURT:  Where is that located?
24            MR. COOPER:  If you give me one second, your
25   Honor.  934 East Delaware Street in Buffalo, New York.
```

```
 1                    USA V. M. RONCONE

 2            THE COURT:  Which is a different clubhouse

 3     than the Outlaws Motorcycle Club house?

 4            MR. COOPER:  In close proximity, but a

 5     separate structure, correct, Judge.

 6            THE COURT:  Okay.

 7            MR. COOPER:  And so the Government's

 8     information, and I'll explain where that comes from in a

 9     moment, as of December 7th when the warrants were

10     executed, the defendant's role was as the vice president

11     of the Buffalo chapter of the Rare Breed Motorcycle

12     Club.  The references earlier to the defendant being the

13     president of the Wellsville chapter are based on

14     information that the government has from more than one

15     witness, information that is corroborated by minute

16     ledgers, essentially church or meetings that the club

17     has, where they describe what they discussed.  So the

18     defendant was the president of the Wellsville chapter.

19     Sometime approximately in November of 2023, the

20     Wellsville chapter is shut down.  I believe the word

21     used in the minute ledger is "suspended."  So it ceases

22     to exist.

23            THE COURT:  Did you say the month that that

24     occurred.

25            MR. COOPER:  November of 2023, your Honor.
```

```
 1                        USA V. M. RONCONE

 2               THE COURT:  Okay.

 3               MR. COOPER:  And so a similar entry into

 4    meeting minutes indicates that "Cone," this defendant.

 5               THE COURT:  "Cone" is that?

 6               MR. COOPER:  Cone is an alias, Roncone is

 7    the defendant's last name, but his alias is "Cone."

 8               That "Cone" had become the vice president

 9    now of the Buffalo chapter.

10               THE COURT:  That is in the meeting minutes?

11               MR. COOPER:  Yes, Judge.  Because there is

12    no Wellsville chapter to preside over anymore.  And so

13    that is the information that we had from witnesses even

14    before the search warrants were executed, which is then

15    corroborated when the Buffalo Rare Breed clubhouse is

16    searched, binders containing minutes from meetings are

17    seized, and then analyzed or at least have begun to be

18    analyzed by law enforcement and entries, as I've

19    described for the Court are discovered.  So they

20    establish this defendant's status both in the Wellsville

21    chapter previously and then in the Buffalo chapter now

22    once the Wellsville chapter has been shut down.

23               I'd like to point out for the Court and

24    focus on, I think, particularly important about the

25    Wellsville chapter shutting down, and that is the timing
```

USA V. M. RONCONE

1
2  of it.

3       On October 24th 2023, the FBI executed

4  search warrants at three locations in and around

5  Wellsville, New York.  It's not the beginning of their

6  investigation, but it was a significant step or a

7  significant date of the investigation.  They search a

8  residence associated with Howard Hinkle.  They search a

9  hunting cabin associated with Howard Hinkle.  And they

10  search a residence of an individual names Frank Knight.

11  During the execution of those search warrants,

12  specifically at Hinkle's residence, law enforcement

13  acquired 19 firearms and well over 100 marijuana plants.

14  Hinkle is charged that day, initially by Criminal

15  Complaint or remains charged by Criminal Complaint to

16  date.  That occurs in late October of 2023.  So there is

17  a significant law enforcement presence now starting

18  which began on August 2nd or 3rd, essentially right

19  after Crystal Quinn is found deceased, the investigation

20  has been going on, but in terms of significant events in

21  Wellsville, October 24th, 2023 was probably the largest

22  or one of the largest law enforcement incidents in

23  Wellsville where the FBI is down there executing

24  numerous search warrants, making arrests.  And very

25  shortly after that, in the month of November 2023, the

                    USA V. M. RONCONE

Wellsville chapter of the RBMC is suspended.

         Roncone goes from being president of that
chapter to vice president of Buffalo.  And it's the
government's position, given all of the evidence in its
investigation to date, that that evinces consciousness
of guilt on behalf of the defendant and on behalf of the
organization as a whole.  While the FBI are
investigating the area, the Wellsville chapter is shut
down, closed off.  It's an attempt to avoid law
enforcement attention.

         I'd like to fast forward to the December 7th
searches and the items recovered.  The court spoke about
being a user in possession of marijuana, and I would
just like to start with exhibit A-1, it's the very first
page of the binder in front of your Honor.  This is a
tray with a credit card, business card, a plastic corner
with white powdery residue inside of it, a white ceramic
or plastic bowl, with what appears to be a white powder
in front of it, and three straws.

         And, Ms. Champoux, if we could zoom in on
the white ceramic color bowl.  And you can see when Ms.
Champoux zooms in that there is appears to be white
powder inside of the bowl.

              THE COURT:  Where was this?

```
 1                    USA V. M. RONCONE
 2            MR. COOPER:  Inside Mr. Roncone's residence.
 3   If you can click out of that, Karen, thank you.
 4            So we have the plastic corner, the credit
 5   card, and I believe that is called a motoring pestle.
 6   The white bowl with the pestle here to crush powder and
 7   then three straws.  This Court has been on the bench for
 8   a long time and I don't need to tell your Honor that
 9   each these items is consistent with the use of
10   controlled substances.  There is the white powder, the
11   plastic bag --
12            THE COURT:  At the hearing in front of Judge
13   Schroeder, there had been no testing of this, is that
14   still the case, or no results?
15            MR. COOPER:  I don't know what the status is
16   at the lab, but I know that we don't have results back
17   yet.
18            I would indicate to your Honor, though, that
19   the set up here in front of you is pretty plain as to
20   what's going on and that is not marijuana.  And I would
21   submit to the Court that there is a pretty significant
22   difference between a user of marijuana possessing the
23   litany of firearms that this defendant possessed and a
24   user of what appears to be cocaine or another substance.
25            THE COURT:  I agree with you.  I think the
```

USA V. M. RONCONE

 1
 2     problem with marijuana is it's legal now in New York
 3     State.  So it's not legal under federal law, but there
 4     is, I'm sure, a lot of owners, possessors of firearms
 5     who also use marijuana.  And the government isn't
 6     charging them, typically, unless there is some other
 7     crime that is involved.
 8                 MR. COOPER:  And I think the government
 9     likely appropriately exercises its discretion with
10     respect to charging that.  I agree with your Honor that
11     it is not frequently charged.  And what I'm focusing on
12     and attempting to draw the Court's attention to is what
13     we have here is evidence of at least use of a more
14     significant controlled substance, a controlled substance
15     that poses a more significant risk to the community when
16     assessing danger to a person who possesses a litany of
17     firearms, including the firearm recovered at the Alma
18     Hill property that we'll get to in a little while.
19                 This is consistent with a cocaine user, the
20     white powder, the white plastic bag and straws, and that
21     is coupled with the firearms.  I'm not trying to repeat
22     myself.
23                 THE COURT:  But this is the way in which the
24     items were discovered at the residence?
25                 MR. COOPER:  Correct, Judge.  This tray, I

USA V. M. RONCONE

1

2  believe, was recovered from inside of the safe added on

3  the item log.  It was probably put on a table to be

4  photographed.

5          THE COURT:  But, in other words, the tray

6  had the cards along with the drugs and the straws all

7  together?

8          MR. COOPER:  That is my understanding,

9  Judge.  When I spoke with the agents about how these

10 photographs were generated, it's my understanding that

11 the items of evidence are photographed in place, meaning

12 they are photographed as they are observed and then

13 packaged.  And since this is not packaged yet, I'm

14 inferring this is how it was observed, that is based on

15 the conversations about how each photograph was taken,

16 generally, not specific to this picture.

17          THE COURT:  Okay.

18          MR. COOPER:  We go to A-4, Ms. Champoux.

19          Again, we're looking at photograph taken

20 from inside the defendant's residence, Judge.  And again

21 we find what appears to be packaging with a plastic bag

22 corner and a small tie and a small amount of white

23 powder substance inside the bottom of the bag.  Again,

24 this is not marijuana use, this is consistent with use

25 of a different controlled substance, likely cocaine

```
1                    USA V. M. RONCONE
2    based on the packaging.  The import of this, again, is
3    as it relates to the possession of the firearms and the
4    danger that a cocaine user possessing all of these
5    firearms poses to the community.
6              I would also note for the Court, just to
7    step aside from the exhibit A-4 for a moment and to look
8    at the Pretrial Services Report that the defendant did
9    admit to some drug abuse in the Pretrial Services
10   Report, including cocaine use.  It would be the
11   government's position, based on what was recovered here,
12   that the defendant likely minimized or fibbed about the
13   recency of that cocaine use and the frequency of that
14   cocaine use, but he did acknowledge cocaine use and that
15   is consistent with what was recovered.
16             It's also important to point out that when
17   being interviewed as the search was being executed, the
18   defendant denied any controlled substances being inside
19   of the house.  That is not consistent with what was
20   found.
21             THE COURT:  He denied that to who?
22             MR. COOPER:  Denied that to I believe
23   Special Agent Brian Burns from the FBI.
24             THE COURT:  When the search warrant was
25   being executed you said?
```

```
1                        USA V. M. RONCONE
2              MR. COOPER:  That's correct, Judge.  So the
3    way it played out, I wasn't there, based on the
4    conversations with the agents, that when the warrant is
5    executed, persons who are inside are at least
6    temporarily detained as the residence is being cleared.
7    And at that time, Agent Burns or another agent asked Mr.
8    Roncone if there was anything dangerous inside of the
9    home, anything that would hurt agents and any drugs and
10   the defendant denied that and that is inconsistent with
11   what was recovered.
12             If we turn to A-5 for a moment, Ms.
13   Champoux.
14             Bag of marijuana again found inside of the
15   defendant's residence.
16             THE COURT:  Has this been tested?  It looks
17   like marijuana.
18             MR. COOPER:  Judge, no, it has not been
19   tested yet.  The drug items have been brought to the
20   laboratory.  There is a significant amount of items
21   dropped off at once.  I don't have reports back from
22   them yet.  But based on the agent's training and
23   experiences, packages and appearance, they believe this
24   to be marijuana.  It certainly appears, in my eight
25   years of experience as a prosecutor, to be marijuana.
```

                          USA V. M. RONCONE

1

2    And there have been chemical tests requested for these

3    items, but they are not back here.

4              THE COURT:  Do you know when you expect to

5    have them back?

6              MR. COOPER:  Most recently, the Niagara

7    County Laboratory informed us to get all of the results

8    back for everything that was delivered, which included

9    the 100 marijuana plants or 150 marijuana plants from

10   Hinkle's residence, they said about two months.  I'll be

11   following up with the Niagara County Lab.

12             THE COURT:  Hinkle marijuana plants were

13   seized back in October?

14             MR. COOPER:  October 24th.  Our indication

15   is we're expecting results back from everything that has

16   been delivered in about two months.  I plan to follow up

17   with the lab this week and ask to expedite.

18             THE COURT:  Two months from now in other

19   words?

20             MR. COOPER:  Two months from yesterday or

21   two days ago.

22             THE COURT:  Okay.  If we look at exhibit B-1

23   next, Ms. Champoux.  Thank you.

24             This is one of the firearms that were

25   recovered inside the defendant's residence.  And I want

USA V. M. RONCONE

1
2  to obviously front for the Court what Judge Schroeder
3  discussed with the government, which is that these
4  firearms were otherwise lawfully possessed and the
5  government acknowledges that, as far as we know, with
6  the information available to us right now, the firearms
7  recovered from Mr. Roncone's residence would have been
8  otherwise lawfully possessed but for his status as a
9  user of controlled substances.  However, again, the
10 government's position is that when you have a defendant
11 who is in a leadership position in a motorcycle gang who
12 is using cocaine and using marijuana and who is
13 possessing this litany of firearms, that poses a danger
14 to the community.  And so it's, I guess, the
15 government's position, separate and apart from whether
16 this firearm was otherwise purchased legally, because
17 you can't possess it if you're a user of controlled
18 substances, which this defendant, by his own admission
19 to pretrial services, is.
20          We go to B-2, Ms. Champoux.  This is another
21 firearm recovered from inside the defendant's residence.
22          And then if we can go to B-3, Ms. Champoux.
23          Two more firearms, Judge, also recovered
24 from inside the residence.
25          THE COURT:  The defendant's residence, he

```
 1                        USA V. M. RONCONE
 2    lived there with who?
 3                  MR. COOPER:  Judge, I don't know who else
 4    was present, if anyone else was present at the time of
 5    the search.
 6                  THE COURT:  I think he has indicated in the
 7    bail report he lives with his father.
 8                  MR. COOPER:  I believe that is accurate.  I
 9    don't know if he was present at the time the warrant was
10    executed.
11                  MR. DELL:  He was.
12                  THE COURT:  Who said he was?
13                  MR. DELL:  I did.
14                  THE COURT:  Okay.
15                  MR. DELL:  His father was present when they
16    executed the warrant.
17                  THE COURT:  And this is in Lancaster, a
18    residence in Lancaster, correct.
19                  MR. COOPER:  That's correct, Judge.  So
20    there was a firearm that Mr. Tripi proffered about and I
21    just want to clarify something for the Court.
22                  If we go to B-24, Ms. Champoux.
23                  Judge, Mr. Tripi proffered in front of Judge
24    Schroeder that B-24 was being examined more closely
25    because there was a suspicion by law enforcement agents
```

USA V. M. RONCONE

1
2    that the serial number had been altered in some way.

3         Ms. Champoux, can you zoom in on the serial
4    number?  That was the opinion of agents who are not
5    firearms experts, but they believe that this "Z," the
6    final digit in the serial number, appear to be altered.
7    They believe the bottom line of the "Z" on the
8    right-hand side of this photograph, it has been changed,
9    essentially, into the firearm from a "7" to become a "Z"
10   and that belief was based on the appearance of the
11   firearm, the appearance of the serial number, and the
12   there is some discoloration around the right side of it.
13   That attempt appeared it was trying to be filed down
14   after it was tapped.  So that proffer was made in good
15   faith by the government.  However, we also look to
16   verify that information.  However, this morning, I found
17   out a half hour before court, that serial number was run
18   through the ATF system and it was not tampered with or
19   defaced.  I want to clarify that for the government and
20   Mr. Dell.  The government did hedge that argument that
21   it was not confirmed, but it's now been confirmed that
22   that serial number was not edited or altered based on
23   the ATF's trace report.

24         You can take that down, Ms. Champoux.  Thank
25   you very much.

                        USA V. M. RONCONE

1
2              If we go to C-4, Ms. Champoux.  Thank you.

3              So here we have an ammunition crate

4    containing what appears to be rifle ammunition in a

5    fairly large quantity.

6              If you go to D-1, Ms. Champoux.  Thank you.

7              Judge, on D-1 we're looking at some rings,

8    some evidence that was seized from the defendant's

9    residence, just evidence of association with the motor

10   cycle club.  The government has been proffering to your

11   Honor that this defendant had a membership in the Rare

12   Breed Motorcycle Club.  This evidence is obviously

13   corroborative evidence of an association with that

14   organization.

15             THE COURT:  I think Mr. Tripi made the

16   argument to Judge Schroeder this was a means by which to

17   have brass knuckles.

18             MR. COOPER:  And, Judge, that is also, I

19   believe, a valid argument.  Brass knuckles are illegal

20   in New York similar to some of the other weapons that

21   were recovered in other searches.  I know your Honor has

22   presided over several other defendants that were

23   searched and arrested on December 7th.  Similar to the

24   bandana with the padlock buckled around with it, that is

25   not illegal to walk around and carry, but it can be a

```
                          USA V. M. RONCONE
 1
 2   very damaging weapon when used to wrap around your fist
 3   and strike somebody.  Similarly, heavy metal weighted
 4   rings is not illegal.  You get stopped, there is no
 5   issue of wearing heavy weighted metal rings, but it does
 6   cause more damage.
 7             THE COURT:  So Mr. Roncone lives in a
 8   residence with his father.  Why am I to conclude -- what
 9   information does the government have that all of the
10   rings depicted in D-1 belong to the same individual?
11             MR. COOPER:  Judge, I'll follow up on that
12   and confirm which room they were seized out of.  I don't
13   have that off the top of my head, but I'll get that
14   information for you.
15             Ms. Champoux, if you can go to D-5.
16             THE COURT:  Let me go back a moment.  As
17   you're standing here right now, you cannot tell me all
18   of the rings belong to the same individual.  Is that a
19   fair statement?
20             MR. COOPER:  That is a fair statement,
21   Judge.
22             Would you go to D-5, Karen.  Thank you.
23             Again evidence corroborating the
24   government's proffer to this Court that the defendant is
25   a member of the Rare Breed Motorcycle Club, this
```

                         USA V. M. RONCONE

1

2   includes a patch underneath -- if you zoom in on the top

3   right corner.  Thank you.  Indicating a location,

4   specifically Wellsville, the information available to

5   the government is that the defendant's father, whom he

6   lives with, is the president of the Buffalo chapter and

7   so this vest with the bottom patch of Wellsville would

8   indicate to the government that it long belongs to this

9   defendant and not his father.  Thank you.

10              And then, Ms. Champoux, if you go to D-6.

11              This is the back of that vest again showing

12  the patches of the Rare Breed Motorcycle Club.  And at

13  D-7, this is a different vest, Judge, and you can see in

14  the top left corner, if Ms. Champoux will Zoom in here,

15  we have a patch indicating "Buffalo," another patch on

16  the right side.  You can take it down.  Another patch on

17  the right side indicating lifetime membership.  It's the

18  believe this is the vest of the defendant's father.  So

19  there is evidence of both of these individuals being

20  members of the Rare Breed Motorcycle Club based on the

21  evidence recovered from the search warrant.

22              If we can go to E-2.

23              Judge, what we have here is a poster saying

24  someone talked with a person sinking in water.

25              THE COURT:  Somebody is what?

```
 1                    USA V. M. RONCONE
 2              MR. COOPER:  Sinking in what appears to be
 3    water, that is what I see when I look at it.
 4              THE COURT:  You're talking about this
 5    poster?  I'm sorry, I'm looking at the wrong thing.
 6              MR. COOPER:  E-2.
 7              THE COURT:  Got it.
 8              MR. COOPER:  So there is the words at the
 9    top "someone" the word at the bottom "talked" and it's
10    an individual that appears to be sinking in water.  This
11    is consistent with other imagery you've seen from other
12    searches.
13              THE COURT:  Where was this taken?
14              MR. COOPER:  I believe the Buffalo Rare
15    Breed clubhouse, Judge.
16              I'm sorry.  Ms. Champoux made me a list, and
17    I misplaced it.  It's from the Rare Breed clubhouse in
18    Buffalo, Judge.
19              THE COURT:  Okay.
20              MR. COOPER:  Next if we go to E-3.
21              THE COURT:  We're still on the Rare Breed
22    clubhouse in Buffalo?
23              MR. COOPER:  Yes, your Honor.  This entire E
24    series of exhibits is going to be from the Rare Breed
25    clubhouse in Buffalo.  And if we zoom in here.  The
```

USA V. M. RONCONE

poster stating "Due to the rising cost of ammunition,
I'm no longer able to provide a warning shot," with a
firearm depicted on it.  Again, in the context of this
organization, the organization's role as a support club
for the Outlaws Motorcycle gang, this poster evinces a
belief within members of the group or a willingness to
use firearms.  And I should say use firearms to shoot
individuals, not to hunt or target practice.

If you can go to E-4, Ms. Champoux.  We're
still inside the Rare Breed Buffalo clubhouse and here
we have what appears to be a Nazi swastika or flag.  Ms.
Chalbeck provided a proffer to Judge Schroeder.  She
certainly spoke more intelligently than I can on the
subject about what the symbolism of this poster is.  And
to summarize Ms. Chalbeck's proffer, which is contained
in the transcript that your Honor has, those letters
NSKK at the top of the flag relate to, essentially, a
Nazi motorcycle group, for lack of a better phrase.  So,
again, does the First Amendment protect freedom of
speech?  It absolutely does.  Does this give a window
into somebody's mind-set?  It absolutely does.  So I
think it's worth pointing out to the Court and I think
it is something the Court can consider.  It's a symbol
of hatred.  A symbol related to the extermination of a

USA V. M. RONCONE

1
2    certain race of people, and a symbol that I think it
3    speaks to the mind-set of individuals who essentially
4    pledge their lives to these organizations.
5              If we go to exhibit E-9, Ms. Champoux.
6              Judge, here we're looking at, again, this is
7    seized from the Rare Breed Buffalo clubhouse, and it's a
8    binder containing a second superseding indictment
9    involving a prosecution in the Western District of New
10   York against a motorcycle gang.
11             THE COURT:  Back in 2009?
12             MR. COOPER:  That's correct, Judge.  I think
13   the indictment --
14             THE COURT:  Well, it's an 09 number.
15             MR. COOPER:  Okay.  I saw an 08 number above
16   it - a 2009 indictment.
17             THE COURT:  This was a binder found in the
18   Rare Breed Buffalo clubhouse?
19             MR. COOPER:  Yes, your Honor.
20             Mr. Tripi proffered to Judge Schroeder, and
21   we're going to continue to proffer about the association
22   that the Rare Breed motorcycle gang has with the Outlaws
23   motorcycle gang.
24             If you go to E-10, Ms. Champoux.
25             I spoke with you before your Honor about

                          USA V. M. RONCONE

1  binders that contain meeting minutes from the Rare

2  Breed.  Ms. Champoux zoomed in on a line from one of

3  those meeting minutes indicating that Taco Bowman's

4  funeral is planned for this Saturday.  It says "Taco"

5  not Taco Bowman to be clear, but Taco Bowman was a

6  longtime leader of the Outlaws motorcycle gang.  This is

7  an indication that the Rare Breed was tracking when his

8  funeral was.

9          THE COURT:  When did he die?

10          MR. COOPER:  In 2019, Judge.

11          If we go to E-11, please.  Thank you.

12          Here, if you look at line item 7 on exhibit

13  E-11, again, a reference to this legendary Outlaws

14  motorcycle member's funeral in Dayton, Ohio showing the

15  association between these two organizations.

16          And if you just remove that zoom in for a

17  second, Karen.  Thank you.  If you can zoom in on 6, Ms.

18  Champoux.

19          Just above that in line item 6 on exhibit

20  E-11 indicates that the club or gang is trying to get

21  sponsors for Blues Cruise event.  It's a party they put

22  on every so often.  And this is important to look at

23  because what we found in the search of the Pharaoh's

24  Gentlemen's Club is a plaque from the Blues Cruise

```
1                    USA V. M. RONCONE
2    indicating that Pharaoh's provided sponsorship.  It's a
3    plaque that the Rare Breed gave to Pharaoh's.  And I'll
4    get into a why that is significant and should be
5    significant to your Honor.
6                    If we can go to E-12, and line item 10.
7                    Again, Rare Breed meeting minutes announcing
8    to members of the club that the Pharaoh's anniversary
9    party is next Wednesday.  This is evidence of
10   association between the organization at Pharaoh's and
11   the Rare Breed Motorcycle Club.  And, importantly, as
12   your Honor knows, John Ermin, also known as Tommy O, has
13   essentially managed Pharaoh's for years and he is also
14   the international or national president of the Outlaws
15   Motorcycle Club, and so you're seeing this nexus between
16   Pharaoh's and members of the Outlaws.
17                   THE COURT:  I wouldn't say that I know that
18   he is the president of the Outlaws Motorcycle Club.
19                   MR. COOPER:  If I -- I didn't mean to phrase
20   it, it's been proffered by the government that he
21   maintains his status as the president or international
22   president of the Outlaws.
23                   THE COURT:  That's been proffered by the
24   government, but I think it's a fair statement to say
25   it's not clear to me what the government is relying on
```

                         USA V. M. RONCONE

1

2    other than one witness I think Mr. Tripi identified.  I

3    don't know that.  I mean that is a question I still have

4    in my mind.

5               MR. COOPER:  I can --

6               THE COURT:  Because I asked -- I don't know

7    if you were here for Mr. Ermin's detention.

8               MR. COOPER:  I was not, Judge.

9               THE COURT:  And I asked Mr. Tripi, and I

10   have to go back and look at the transcript, but what he

11   was basing that information on, and I believe he

12   identified one witness.  I don't know if he identified

13   anything else to support the conclusion that Mr. Ermin

14   is the president of the international organization.

15   Clearly he had a leadership role in the organization.  I

16   don't think that is reasonably disputed.  So that is why

17   I just, I wouldn't say, you said, "as you know, he is

18   the president, "I guess I wouldn't accept that at this

19   point, at least.

20               MR. COOPER:  Thank you for clarifying that

21   and I should tighten.  It's been proffered by the

22   government, I didn't mean to presume that your Honor has

23   accepted that.  And I find myself trying to walk a tight

24   rope between giving your Honor the information that your

25   Honor needs while also maintaining safety of

                    USA V. M. RONCONE

1    individuals, and so I certainly don't mean to be coy

2    with your Honor when you ask me questions.

3         THE COURT:  I appreciate that, and that is a

4    tight rope that the government has to figure out how to

5    walk.  But, obviously, as I told Mr. Tripi as well, it's

6    your burden of proof.  You can proceed by proffer.  One

7    of my jobs is to assess the reliability of the evidence

8    that is being proffered.  And if the government is not

9    able to reveal to me enough specifics about the basis

10   for that proffer, that may lead me to conclude that the

11   evidence is not something that I can rely on in the

12   context of this hearing.

13         MR. COOPER:  I can tell your Honor that in

14   addition to the source of information that Mr. Tripi

15   reported to you, that there has been a second or

16   separate source of information discovered recently by

17   the government that indicates similarly that Ermin is

18   either the president of the country or the president of

19   the east coast of the Outlaws.  And that was information

20   discovered fairly recently in the investigation.  I

21   don't want to be more specific than that.  I'll move on.

22   I don't think that I need to spend more time there.

23         But the nexus between the Outlaws Motorcycle

24   Club the Rare Breed Motorcycle Club and the Pharaoh's

```
 1                    USA V. M. RONCONE
 2   Gentlemen Club is particularly important to the reason
 3   for this Court to have serious concerns about flight
 4   risk, serious concerns about danger to witnesses that
 5   are exposed, should this defendant or other similarly
 6   situated defendants be released.  And I would like to
 7   move to that part of the proffer now.
 8                    So would you take that down, Ms. Champoux?
 9                    Judge, on August 1st, 2023, 911 is called by
10   an individual named Simon Gogolack to report there is a
11   dead person in his house.  The police respond, Gogolack
12   is erratic and they observe a woman deceased in a bed.
13   That woman turns out to be Crystal Quinn, who was
14   scheduled or slated to testify at an upcoming federal
15   trial.  One of the first observations made by law
16   enforcement when they respond to that scene is that it
17   appears to them, based on their training and experience,
18   that she has been dead for quite some time.  It didn't
19   appear that she recently expired or recently suffered
20   from an overdose.  In fact, the information that was
21   conveyed to the FBI, she appeared to be fully rigger or
22   in full rigor mortis.  The investigation later
23   determined that it was likely that Quinn had been dead
24   between 12 and 36 hours by the time 911 was called.  The
25   house that she was found in was broken into essentially
```

USA V. M. RONCONE

a very small liveable area and then most of the house,
which was in utter disarray, exposed walls, holes in the
walls, holes in the window, it's not like there was this
large area in the house to not notice the dead person.
It was a very small living area.  The death of Crystal
Quinn was not called in until a significant period of
time after she is believed to have died.  That
individual, Simon Gogolack, is obviously the closest
person to Quinn's death because he calls it in and is
there when she is discovered.  Law enforcement's
investigation finds out over the course of weeks and
months that this has been going on, that the FBI has
been interviewing witnesses, executing search warrants,
examining phones, that Gogolack brought Quinn down to
Wellsville just the weekend before she is found dead.
On July 27th, when he drives Quinn down to Wellsville,
he brings, essentially, straight to a poker game, where
she encounters either members or associates of the Rare
Breed Motorcycle Club.  It's a poker game that has
historically been hosted by and attended by members of
the Rare Breed Motorcycle Club.  Specifically, up until
maybe a year or year and a half ago, the person who is
believed to control that game, to accept the money and
hand out the chips is this defendant, Michael Roncone.

```
 1                    USA V. M. RONCONE
 2   So this poker game that Quinn is brought to is closely
 3   connected to the Rare Breed Motorcycle Club.
 4              THE COURT:  Can I interrupt you there?
 5              MR. COOPER:  Of course.
 6              THE COURT:  You say up to a year, year and a
 7   half ago Mr. Roncone was, essentially, the organizer of
 8   this poker game, but it's not the government's
 9   contention that he organized the July 27 poker game?
10              MR. COOPER:  That's correct, your Honor.
11   And so what I was trying to point out for your Honor is
12   there is a long historical period indicating that this
13   game in particular is a game associated with members of
14   the Rare Breed Motorcycle Club attended by members and
15   at least formerly run by this defendant.
16              THE COURT:  Is it held on an annual basis or
17   just a regular poker game?
18              MR. COOPER:  I think it's held on a regular
19   basis.  I wouldn't say annual, more frequent than
20   annual.
21              THE COURT:  Okay.
22              MR. COOPER:  When Gogolack brings Quinn to
23   that poker game, he interacts with an individual named
24   Howard Hinkle.  Hinkle is believed to be, based on the
25   investigation, at a minimum, an associate of the Rare
```

1          USA V. M. RONCONE

11:26:07   2    Breed Motorcycle Club.  Hinkle and Gogolack show up very

11:26:14   3    late to the game.  They essentially abandon Crystal

11:26:20   4    Quinn at one point.

11:26:21   5              THE COURT:  Do you have video of this?

11:26:25   6              MR. COOPER:  Yes, Judge.

11:26:26   7              Walk away from Ms. Quinn, have private

11:26:28   8    conversations, come back to her, and, ultimately, they

11:26:31   9    take Quinn to Hinkle's cabin.  After being at Hinkle's

11:26:35   10   cabin, they return late, either late on the night of the

11:26:40   11   27th or in the early morning hours of the 28th to

11:26:44   12   Gogolack's residence.

11:26:45   13             THE COURT:  They being Gogolack and Quinn?

11:26:49   14             MR. COOPER:  And they are dropped off there

11:26:52   15   by Hinkle.  Just hours after they are dropped off back

11:26:56   16   at Gogolack's residence in the early morning hours of

11:27:07   17   July 28th, 2023, Crystal Quinn exchanges text messages

11:27:13   18   with two different individuals.  One of the individuals

11:27:16   19   that she is text messaging with is Simon Gogolack.  Now,

11:27:20   20   the Court can infer they are not sitting in the same

11:27:23   21   room together if they are text messaging.  And the

11:27:26   22   contents of their text messages confirm that they've

11:27:29   23   become separated at this point.  The first text message

11:27:34   24   is Crystal Quinn asking, "Where are you?"  This is

11:27:36   25   approximately 5:30 in the morning, the early morning

USA V. M. RONCONE

2  hours of July 28th.

3          Gogolack tells Quinn "top of road."

4          Quinn responds to that text message at 5:32

5  and says "We are fine.  They are not hurting me."

6          That time frame from 5:30 to 6 a.m., time

7  frame is instructive, not just because of the text

8  messages that Quinn is exchanging with Gogolack, but

9  because of the text messages that Quinn is exchanging

10 with another individual.

11         She sends a text message at 5:39 a.m. to

12 another individual, not a person in Wellsville, a

13 personal relationship of hers, and she says, "Call me."

14 At 5:41 a.m. she says, "Yeah, I just heard Simon

15 speaking to one of the bikers."  At 5:42 a.m. she

16 writes, "I think he is getting me set up right now.  I

17 hear him outside."  Quinn continues, 5:43, "Call me now,

18 911."  I'm skipping some if the messages in between.  At

19 5:52, Quinn texts "pick up."  At 5:54 a.m., Quinn texts

20 the person's name and then says "me and Simon are in

21 danger, call me."

22         It's not my intent to read every text

23 message that is contained in there.  I want to give your

24 Honor a picture of what Quinn was texting.

25         THE COURT:  Mr. Tripi proffered during Mr.

USA V. M. RONCONE

11:29:43  2   Ermin's appeal that Ms. Quinn was texting somebody who

11:29:47  3   was in her personal contacts, but it was the wrong

11:29:50  4   number.  Is that what this is?

11:29:53  5               MR. COOPER:  Correct, Judge.  So this person

11:29:55  6   had a prior phone number and then a current phone number

11:29:58  7   and Quinn was texting the old phone number and so the

11:30:02  8   messages were received by an individual who now had that

11:30:06  9   phone number, but was not the individual she was

11:30:09  10  intending to communicate with.

11:30:10  11              THE COURT:  So these messages that you are

11:30:13  12  reading are messages Quinn is sending out but not

11:30:16  13  getting any response.

11:30:17  14              MR. COOPER:  That is correct.  In fact, she

11:30:19  15  attempts to call that person repeatedly.  And when she

11:30:23  16  attempts to call, she calls the correct contact, but,

11:30:26  17  essentially, during the text messages, it's the

11:30:28  18  government's position that she panicked based on what

11:30:32  19  she is saying in the text messages that she is texting

11:30:37  20  the older version of that context and never gets and

11:30:40  21  never gets the help she was asking for.

11:30:41  22              THE COURT:  Maybe I misheard you.  Did she

11:30:45  23  end up speaking to this person?

11:30:47  24              MR. COOPER:  Not in this time frame, Judge.

11:30:49  25              THE COURT:  Okay.

USA V. M. RONCONE

11:30:50  2    MR. COOPER:  And so those are text messages

11:30:52  3   between 5:30 and about just before 6 a.m. on July 28th.

11:31:01  4   Going back to the text messages that Quinn exchanges

11:31:03  5   with Simon, she tells him at 5:32, "We're fine.  They

11:31:08  6   are not hurting me."  And at 5:33, and she says, If they

11:31:13  7   do, just let it happen, don't get your ass killed."

11:31:17  8    THE COURT:  She says that?

11:31:18  9    MR. COOPER:  Correct.  She says, "If they

11:31:20  10   do, just let it happen, don't get your ass killed."

11:31:24  11    THE COURT:  She says that to Gogolack?

11:31:26  12    MR. COOPER:  Correct.  And 10 minutes after

11:31:33  13   she sends that message to Gogolack is when she texts

11:31:37  14   this other individual that she heard Simon talking to

11:31:41  15   one of the bikers and she thinks he is setting her up.

11:31:45  16   And so initially she is texting Gogolack thinking he is

11:31:51  17   defending during this 5:30 a.m. standoff at the house in

11:31:55  18   Wellsville.  And 10 minutes later she is texting the

11:31:58  19   message to this individual saying Simon is setting her

11:32:06  20   up, pleading for help and setting her up with bikers.

11:32:11  21    At 5:35, Quinn texts Gogolack, "Should I

11:32:14  22   lock door?"  And then she texts him "let them kill me."

11:32:22  23   At 5:36 she texts Gogolack, "They are coming in, aren't

11:32:28  24   they?"  I read those portions of the text messages to

11:32:55  25   try to paint a picture for the Court of what went on,

USA V. M. RONCONE

what was going through Quinn's head of maybe two days

before she is found dead.  She is indicating that she is

afraid.  And she is indicating that Gogolack is setting

her up with bikers.  That is what she is telling to a

person who she texts 911 and "call me now, I'm in

danger."  That is her attempt to let somebody know what

is happening to her.

At the time all of that is going on, this

defendant is presiding over the biker gang in Wellsville

as the president.  He is known to have a close

association with the person who took over the poker

game, and he is known to have a close association with

Hinkle, the person who met with Gogolack and took Quinn

out from the poker game and ultimately back home.

THE COURT:  Was Mr. -- does the government

believe Mr. Roncone was present at either Mr. Gogolack's

house or at the poker game?

MR. COOPER:  I don't.

THE COURT:  Let me re-ask the question.

Does the government have any information to proffer that

Mr. Roncone was present at the poker game or at Mr.

Gogolack's house on the evening or early morning hours

of July 28th?

MR. COOPER:  No, Judge.  I don't have

USA V. M. RONCONE

11:34:24  2  information to proffer to you that he was physically

11:34:26  3  present at either of those locations.

11:34:28  4          THE COURT:  And so you say that you have

11:34:30  5  information, though, that he is a close association with

11:34:34  6  Mr. Hinkle and the person who was running the poker

11:34:37  7  game?

11:34:37  8          MR. COOPER:  That's correct, Judge.  And

11:34:38  9  that is based on text message communications and reviews

11:34:41  10  of phone records and analysis of phone records and

11:34:45  11  interviews of witnesses.  So that is coming from

11:34:48  12  multiple sources, not just coming from interviews of

11:34:51  13  individuals.  It's coming from review of text messages,

11:34:54  14  reviews of phone records.

11:34:58  15          THE COURT:  I feel like I'm missing

11:35:00  16  something here, though, in terms of, and maybe the

11:35:05  17  government doesn't have the information, but I thought

11:35:07  18  you indicated that Ms. Quinn then did connect with this

11:35:11  19  person that she was trying to text and maybe you just

11:35:14  20  haven't gotten to that.

11:35:15  21          MR. COOPER:  No, Judge, we've gotten to it

11:35:17  22  and my understanding of that conversation that occurred

11:35:28  23  after is that Quinn essentially whispered and the woman

11:35:34  24  was unable to be able to hear what was being said.  It's

11:35:37  25  the opinion of that person that essentially she was

                    USA V. M. RONCONE

11:35:42  2  trying to communicate without being overheard and was

11:35:44  3  unsuccessful in doing so.  Now, she doesn't die

11:35:52  4  immediately after that, to be clear.  And so she has

11:35:55  5  other phone contact where she doesn't report this having

11:35:59  6  happened to her mom, to her close personal friend.

11:36:02  7          THE COURT:  So Ms. Quinn has contact with

11:36:04  8  other individuals after the early morning hours of July

11:36:08  9  28th?

11:36:09  10         MR. COOPER:  That's correct, Judge.  And so,

11:36:10  11  and that is about two and a half or three days, three

11:36:17  12  and a half days before she is suspected to have died,

11:36:21  13  which would have occurred between late on the 31st and

11:36:24  14  early on August 1st.  And so there is a period of time,

11:36:30  15  appreciable period of time between those two incidents

11:36:32  16  to be completely transparent about it.

11:36:36  17         THE COURT:  And she has contact with other

11:36:38  18  individuals who she doesn't report this to?

11:36:41  19         MR. COOPER:  That's correct.

11:36:42  20         THE COURT:  And does not express any fear,

11:36:44  21  is that a fair statement?

11:36:45  22         MR. COOPER:  Expresses excitement about

11:36:47  23  coming home and getting out of Wellsville.

11:36:49  24         THE COURT:  Okay.  Well, that may be, you

11:36:52  25  know, I don't know what you can infer from that.

```
         1                    USA V. M. RONCONE
11:37:00 2              MR. COOPER:  So --
11:37:01 3              THE COURT:  Is the government, does the
11:37:02 4     government -- well, is the government able to proffer
11:37:05 5     who the alleged biker's were that were at Gogolack's
11:37:12 6     house in the early morning hours of July 28th?
11:37:17 7              MR. COOPER:  Like who the individuals were?
11:37:20 8              THE COURT:  Yeah, the identity of any of
11:37:22 9     them and whether or not there is a connection with Mr.
11:37:26 10    Roncone?
11:37:26 11             MR. COOPER:  No, Judge, not able to proffer
11:37:28 12    that at this time.
11:37:29 13             THE COURT:  Okay.  And, I mean, you're not
11:37:31 14    proffering -- you proffered that Mr. Hinkle is the one
11:37:35 15    who was at the poker game with them, they go to his
11:37:39 16    cabin, he drops them off, but you're not proffering that
11:37:45 17    he was there during the time that Quinn was sending
11:37:49 18    these text messages?
11:37:51 19             MR. COOPER:  I'm not proffering that, Judge.
11:37:52 20             THE COURT:  Okay.
11:37:54 21             MR. COOPER:  And so I think where I left off
11:37:57 22    was this close association between Knight and Hinkle.
11:38:07 23             THE COURT:  Knight being?
11:38:08 24             MR. COOPER:  The individual who hosts the
11:38:12 25    poker game after Mr. Roncone moved to the Buffalo area.
```

USA V. M. RONCONE

11:38:16  2    THE COURT:  So is it the government's

11:38:19  3  position that on July 27, 28, was Mr. Roncone even

11:38:26  4  living in the Buffalo or in Wellsville at the time?

11:38:29  5    MR. COOPER:  I believe his residence had

11:38:31  6  moved to the Buffalo area at that time, whether he was

11:38:34  7  physically present in Wellsville or not.

11:38:37  8    THE COURT:  I thought you indicated that the

11:38:38  9  Rare Breed Motorcycle Club in Wellsville closed down in

11:38:44  10  November.

11:38:44  11    MR. COOPER:  That's correct.  The chapter

11:38:47  12  shut down in November.  And before the chapter shut

11:38:50  13  down, it's my understanding that this defendant had

11:38:52  14  moved from the Wellsville area to the Buffalo area

11:38:56  15  because his residence in the Wellsville area was the,

11:38:59  16  well, clubhouse, and that burned to the ground about a

11:39:02  17  year and a half so after that happened his residence

11:39:06  18  ceased to exist and he moved in, maybe still, with his

11:39:10  19  father.

11:39:16  20    THE COURT:  There is a reference in the

11:39:19  21  Pretrial Services Report that Mr. Roncone says he lived

11:39:22  22  with his parents and his current address for one year

11:39:26  23  and at 8807 Fisk Road in Akron, New York for three years

11:39:31  24  prior to that.  Is that the Wellsville area that he

11:39:35  25  lived or residence that he lived in?

USA V. M. RONCONE

11:39:38  MR. COOPER:  I don't know the street address

11:39:39  of that.  I believe that the defendant -- the

11:39:43  information that I have is that the defendant was

11:39:44  residing at the Wellsville clubhouse, which burned down.

11:39:48  I don't know if that is the address of the Wellsville

11:39:51  clubhouse or not offhand.

11:39:53  THE COURT:  Okay.

11:40:00  MR. COOPER:  So what I would proffer next,

11:40:02  Judge, is that after the FBI becomes aware of Quinn's

11:40:06  death, it become beginning investigating.  It's

11:40:09  suspicious on its face due to the delay in calling in

11:40:13  her death.  And as the FBI begins to investigate, they

11:40:20  are interviewing individuals who encountered Quinn at or

11:40:23  around the time surrounding her death.  What they learn

11:40:40  during the course of their investigation is that as they

11:40:43  are conducting that investigation, it's being monitored

11:40:46  by members of the -- by members of the Rare Breed

11:40:51  Motorcycle Club.  They are receiving updates from

11:40:53  individuals that are local in Wellsville, specifically

11:40:56  this defendant, receiving updates about what's going on

11:41:00  from individuals local to Wellsville.  Phone records

11:41:04  show connection that this defendant receives phone

11:41:08  contacts from individuals after those individuals were

11:41:15  either contacted by or interviewed by the FBI.

```
              1              USA V. M. RONCONE
11:41:20      2         THE COURT:  Close in time to those
11:41:21      3    interviews?
11:41:22      4         MR. COOPER:  Close in time, correct.  On
11:41:32      5    August 3rd, the individual who hosted the poker game was
11:41:38      6    interviewed by the FBI.  On that same day --
11:41:42      7         THE COURT:  This is Knight, right?
11:41:44      8         MR. COOPER:  Correct.  On that same day,
11:41:47      9    Knight speaks with Roncone, this defendant, regarding
11:41:50     10    Quinn's death.
11:41:51     11         THE COURT:  Well, you say regarding, how do
11:41:54     12    you know he speaks with him regarding Quinn's death?
11:41:57     13         MR. COOPER:  So, Judge, there is a text
11:42:09     14    message that is seized from a phone belonging to Frank
11:42:12     15    Knight where this defendant sent a picture of Crystal
11:42:16     16    Quinn to Frank Knight on August 3rd.  I believe that
11:42:20     17    occurs temporally after their approximately 14-minute
11:42:27     18    phone conversation.
11:42:27     19         THE COURT:  So you have records of a
11:42:29     20    14-minute phone conversation on August 3rd between Mr.
11:42:32     21    Knight and Mr. Roncone?
11:42:34     22         MR. COOPER:  And I believe that is followed
11:42:35     23    by a text message from Roncone to Knight.
11:42:38     24         THE COURT:  Just sending a picture of Ms.
11:42:39     25    Quinn?
```

USA V. M. RONCONE

11:42:40  2    MR. COOPER:  Correct.  And I want to be

11:42:44  3  clear because I don't have the phone records directly in

11:42:46  4  front of me, the order of those could be switched.  It

11:42:49  5  could be the text first and the phone call second, but

11:42:52  6  it's my understanding that both of those occurred on

11:42:55  7  August 3rd, the same day that individual was interviewed

11:42:57  8  by the FBI.

11:42:58  9    THE COURT:  Mr. Knight was interviewed on

11:43:00  10  August 3rd?

11:43:01  11    MR. COOPER:  Correct, Judge.

11:43:01  12    THE COURT:  And it was after the interview?

11:43:04  13    MR. COOPER:  Correct, Judge.

11:43:05  14    THE COURT:  That the contact was made with

11:43:07  15  Mr. Roncone?

11:43:07  16    MR. COOPER:  Yes, your Honor.

11:43:08  17    THE COURT:  And that there is at least a

11:43:11  18  communication through the sending of a photograph by Mr.

11:43:15  19  Roncone to Mr. Knight of Ms. Quinn's image?

11:43:19  20    MR. COOPER:  Correct.

11:43:24  21    THE COURT:  What we also have, Judge, is the

11:43:27  22  furthering of that chain of communication.  So as

11:43:30  23  information comes from Wellsville to the leadership of

11:43:35  24  the Rare Breed Motorcycle Club, it then goes from the

11:43:38  25  leadership of the Rare Breed Motorcycle Club to the

USA V. M. RONCONE

11:43:40 2  leadership of the Outlaws Motorcycle Club.  And you can

11:43:43 3  see phone contacts between this defendant and John

11:43:47 4  Ermin, also known as "Tommy O," occurring surrounding

11:43:53 5  dates that are significant dates in the investigation.

11:43:56 6  For example, dates that interviews are conducted or

11:43:59 7  dates that warrants are executed.  And I don't want to

11:44:02 8  go into those specific dates that those contacts

11:44:06 9  occurred, but I proffer that they occurred on or about

11:44:09 10  the date of significant dates of the investigation.

11:44:11 11      THE COURT:  Can you proffer the extent of

11:44:14 12  the communication?  In other words, like a number?

11:44:16 13      MR. COOPER:  A number of --

11:44:17 14      THE COURT:  How frequent was the

11:44:19 15  communication.  Is this an instance where there were two

11:44:22 16  communications between Mr. Roncone and Mr. Ermin or are

11:44:26 17  we talking about something that occurred on a much more

11:44:30 18  regular basis?  Do you understand my question?

11:44:32 19      MR. COOPER:  I think so.  Can I have a

11:44:34 20  moment to consider it?

11:44:35 21      THE COURT:  Sure.

11:44:47 22      MR. COOPER:  I would proffer at least two

11:44:50 23  instances.  There may be more, but I'm confident in two.

11:44:56 24  And that is surrounding, as I said, significant dates in

11:44:59 25  that investigation when that contact occurs after the

1                USA V. M. RONCONE

11:45:05  2  event.

11:45:08  3            THE COURT:  And it's in close temporal

11:45:11  4  proximity to the event?

11:45:12  5            MR. COOPER:  Correct, Judge.  Close is

11:45:15  6  subjective but --

11:45:16  7            THE COURT:  Let me give you an example.

11:45:17  8  What you just described to me about the contact between

11:45:20  9  Mr. Knight and Mr. Roncone and the exchange of the

11:45:23  10  photograph all on the same day that Mr. Knight was

11:45:26  11  interviewed by the FBI, I would consider that temporally

11:45:31  12  close.  So is the contact between Mr. Roncone and Mr.

11:45:34  13  Ermin similarly temporally close, vis-a-vis significant

11:45:40  14  events in the investigation?

11:45:42  15            MR. COOPER:  Yes.

11:45:44  16            THE COURT:  Okay.

11:45:45  17            MR. COOPER:  With that standard, the same

11:45:47  18  day, yes.

11:45:48  19            THE COURT:  Okay.  So, I guess to summarize

11:46:25  20  the government's proffer on this point, and I think this

11:46:31  21  is before your Honor, but let me finish with this point,

11:46:35  22  it's the government's position that Quinn was murdered

11:46:38  23  and her murder was staged.  She was found to have 1,200

11:46:46  24  nanograms in her system at the time her blood was

11:46:49  25  analyzed.  The medical examiner or coroner who analyzed

1                    USA V. M. RONCONE

11:46:53  2   that toxicology report ruled her death as undetermined

11:46:57  3   as opposed to accident in part because of the quantity

11:47:00  4   of Fentanyl in her system.  A fatality could be caused

11:47:06  5   with as low as 3 or point 3 nanograms per milliliter.

11:47:11  6   The highest amount that that coroner had ever observed

11:47:11  7   in a fatal overdose was 80n milligrams per milliliter.

11:47:19  8   Eighty in his career dealing with Fentanyl overdoses.

11:47:20  9   This was 1200 nanograms per milliliter.  No accident.

11:47:26  10              THE COURT:  Do you have a medical opinion to

11:47:30  11  that?

11:47:30  12              MR. COOPER:  I'm not.

11:47:31  13              THE COURT:  That it was not an accident.  I

11:47:34  14  know you said the coroner has offered an opinion of

11:47:37  15  undetermined.  Does the government have a medical

11:47:42  16  opinion that this was not an accident.

11:47:44  17              MR. COOPER:  What I'm proffering to your

11:47:47  18  Honor and relying on is that it's the person who gave

11:47:51  19  that opinion is a medical doctor, if that is the

11:47:53  20  question.

11:47:54  21              THE COURT:  But that doctor has given the

11:47:57  22  opinion that this was significantly higher, obviously,

11:48:01  23  than any other overdose that the doctor had previously

11:48:06  24  observed.

11:48:06  25              MR. COOPER:  Yes.

1        USA V. M. RONCONE

11:48:07   2        THE COURT:  Eighty is the highest that

11:48:11   3    doctor observed previously, this was 1200, so big

11:48:16   4    disparity.  And has provided an opinion that the cause

11:48:20   5    of death was undetermined in part because of this.

11:48:23   6        MR. COOPER:  Correct.

11:48:24   7        THE COURT:  But that is a little different

11:48:25   8    than having a medical opinion, and maybe it's not

11:48:29   9    possible to have a medical opinion at this point, but

11:48:32  10    having a medical opinion that the cause of death was

11:48:36  11    murder.

11:48:36  12        MR. COOPER:  No.  I think the facts that we

11:48:39  13    have -- the facts that exist, I don't want to over speak

11:48:43  14    because I'm not a doctor.

11:48:44  15        THE COURT:  I mean, I'm just asking about a

11:48:47  16    medical opinion.

11:48:48  17        MR. COOPER:  It's my understanding from

11:48:49  18    conversing with that person that the facts that exist

11:48:52  19    won't provide -- they can't rule out accident and can't

11:48:57  20    definitively state homicide.  What that person

11:49:02  21    determined based on their training and experience was un

11:49:05  22    determined, not accident.  But to be clear with the

11:49:09  23    Court, I don't believe that to be a ruling out of

11:49:11  24    accident, it's a determination of undetermined.  I would

11:49:15  25    submit that that person, in making their decision.  Is,

USA V. M. RONCONE

based upon reviewing medical information and some
surrounding circumstances, the government's
investigation far exceeds the information that was not
available to that person and it's the government's
position, to be clear, not that doctor's position, that
this was not an accident.

            What I would go next to is who has a motive
to see Quinn dead.  I would submit to the Court that
Peter Gerace and the Outlaws Motorcycle Club had a
motive to see Quinn dead.  She was scheduled to testify
and she expressed fear repeatedly to the government, not
about providing information against Gerace, but
providing information against the Outlaws.  Those are
the organizations closely related, as the government has
proffered to your Honor, Ermin and Gerace, the Outlaws
and Pharaoh's, those are the organizations with a motive
to see Quinn dead.

            Gerace has no presence in Wellsville, New
York that the government is aware of.  The Outlaws have
no Outlaw presence in Wellsville, New York.  But what
Gerace and the Outlaws share is an associate in
Wellsville.  They are associated with the Rare Breed
Motorcycle Club.  Bikers in Wellsville, New York.  The
Outlaws have them as a support club and Gerace supports

USA V. M. RONCONE

11:50:53  2  their organization as indicated by the plaque and

11:50:55  3  indicated by the minutes in the Rare Breed ledger.  And

11:50:59  4  so I'm hoping that what the Court is beginning to see is

11:51:04  5  the association of all of these individuals and

11:51:07  6  essentially the chain of events that occur where Quinn

11:51:11  7  ends up down in Wellsville and is found dead and the

11:51:15  8  individuals and organizations that are associated with a

11:51:18  9  motive to have Quinn dead.

11:51:23  10          As the government's investigation ramps up,

11:51:25  11  the communication tracks government events, as I've

11:51:29  12  proffered to your Honor, and the organization shuts down

11:51:32  13  its Wellsville chapter, no more.  That is, as warrants

11:51:37  14  are being executed, as arrests are being made, and I'm

11:51:47  15  sure, and I have a great amount of respect for Mr. Dell,

11:51:50  16  and I'm sure Mr. Dell will tell your Honor that he is

11:51:55  17  not charged with any of this and he is right, and I

11:51:58  18  submit the government's investigation is ongoing and it

11:52:00  19  takes time and I am proffering the information I'm able

11:52:04  20  to proffer at this time.  But I certainly think it's of

11:52:08  21  value to consider whether this defendant is a flight

11:52:10  22  risk and whether this defendant poses a danger to others

11:52:13  23  or the community.

11:52:16  24          Just a couple of exhibits that I failed to

11:52:27  25  hit on, Judge, that I would like to direct your

|        |    | USA V. M. RONCONE |
|--------|----|-------------------|
| 11:52:30 | 2 | attention to in exhibit G-1.  This is also from the |
| 11:52:35 | 3 | Buffalo clubhouse.  The government recovered a human |
| 11:52:38 | 4 | skull.  It was examined by the Erie County Medical |
| 11:52:42 | 5 | Examiner's office.  The person who examined it has a |
| 11:52:45 | 6 | title that is escaping my memory right now, but a person |
| 11:52:49 | 7 | who specializes in reviewing human remains and bones |
| 11:52:53 | 8 | determined that this was in fact a human skull. |
| 11:53:00 | 9 | THE COURT:  Mr. Tripi proffered that it was |
| 11:53:03 | 10 | Native American? |
| 11:53:04 | 11 | MR. COOPER:  That is based upon the |
| 11:53:05 | 12 | information that was received from this expert who |
| 11:53:07 | 13 | examined the bones.  I don't have enough individual |
| 11:53:12 | 14 | knowledge to tell the Court about the basis for that |
| 11:53:14 | 15 | opinion was, but that was the person's opinion that |
| 11:53:16 | 16 | reviewed the item. |
| 11:53:17 | 17 | THE COURT:  He also proffered, stated, and |
| 11:53:20 | 18 | maybe it's true, I don't know, that it's illegal to |
| 11:53:23 | 19 | possess the skull of a Native American person off of a |
| 11:53:27 | 20 | reservation.  Are you familiar with that? |
| 11:53:30 | 21 | MR. COOPER:  It's outside of my area of |
| 11:53:33 | 22 | knowledge, Judge. |
| 11:53:33 | 23 | THE COURT:  Okay. |
| 11:53:40 | 24 | MR. COOPER:  The next thing -- |
| 11:53:41 | 25 | THE COURT:  When I say he proffered, I mean |

USA V. M. RONCONE

11:53:43   2    to Judge Schroeder he proffered in connection with Mr.

11:53:46   3    Roncone's detention hearing.

11:53:47   4              MR. COOPER:  Yes, Judge.  I recollect what

11:53:52   5    your Honor is referring to from the transcript.

11:54:13   6              Ms. Champoux, can we go to J-1, please?

11:54:16   7              And then just to wrap up, Judge, we're

11:54:21   8    starting now in the series of J exhibits.  These are

11:54:24   9    items that were recovered from Roncone's trailer at the

11:54:30  10    Alma Hill property.  So this is in Wellsville or in the

11:54:32  11    area surrounding Wellsville.  And it's where the Rare

11:54:36  12    Breed had set up, essentially, a base of operations

11:54:38  13    after the clubhouse burned down.  There were numerous

11:54:41  14    trailers on the property.  The trailer associated with

11:54:44  15    Mr. Roncone was determined to be associated with Roncone

11:54:47  16    in several ways.  Inside that specific trailer was his

11:54:51  17    Covid-19 vaccination card and other personal

11:54:55  18    identification documents indicating his --

11:54:58  19              THE COURT:  This was in the trailer by?

11:55:01  20              MR. COOPER:  Alta Hill is like a large piece

11:55:05  21    of property that was searched by the property on that

11:55:11  22    piece of property.  On that large piece of property

11:55:11  23    there were numerous trailers, probably a dozen or more.

11:55:15  24    Those trailers were all within the scope of the warrant

11:55:18  25    in the confines of this property controlled by the Rare

                              USA V. M. RONCONE

11:55:21   2   Breed.  One of those trailers was associated with this

11:55:24   3   defendant Roncone, and I'm explaining to your Honor the

11:55:27   4   indicia of occupancy or evidence that supports that

11:55:32   5   inference.  So there was --

11:55:33   6              THE COURT:  This is in the Wellsville area?

11:55:34   7              MR. COOPER:  Yes, Judge.

11:55:35   8              THE COURT:  Okay.  And so this is where

11:55:37   9   after the clubhouse burned down in Wellsville about a

11:55:41  10   year and a half ago or give or take this Alma Hill

11:55:45  11   property became the new base of operations for the club

11:55:48  12   in Wellsville.  And so that trailer indicated, both by

11:56:01  13   its like registration, there was a temporary driver's

11:56:04  14   license in the defendant's name inside that trailer and

11:56:07  15   inside that same trailer is this firearm on the screen

11:56:11  16   in front of your Honor.

11:56:17  17              Ms. Champoux, if you go to J-4.  There is a

11:56:23  18   large quantity of ammunition discovered inside that

11:56:26  19   trailer.

11:56:26  20              And then in J-5, Ms. Champoux, there is a

11:56:33  21   box of law enforcement ammunition indicating a label on

11:56:39  22   it "Property of U.S. Government, not for resale."

11:56:41  23              THE COURT:  Has there been any further

11:56:43  24   evidence about this?

11:56:44  25              MR. COOPER:  So warrants were executed on

```
 1                    USA V. M. RONCONE

 2   December 7th.  On December 7th or December 8th, we began

 3   investigating the origin of the ammunition.  And so I

 4   don't believe there is an update beyond what Mr. Tripi

 5   proffered to Judge Schroeder, which I know that your

 6   Honor is familiar with.

 7             THE COURT:  Which is it was traced to the

 8   Marshal Service.

 9             MR. COOPER:  Correct.  I think from the

10   Department of Homeland Security, it was somehow

11   transferred to the Marshal Service.  And I don't believe

12   there has been an update beyond that in the

13   investigation into the origin of this ammunition.

14             THE COURT:  But this was in the trailer that

15   has been identified as Mr. Roncone's.

16             MR. COOPER:  Correct, Judge.

17             THE COURT:  Okay.

18             MR. COOPER:  You can take that down, Ms.

19   Champoux.  Thank you.

20             THE COURT:  What is the difference between

21   law enforcement ammunition and ammunition that you can

22   buy?

23             MR. COOPER:  Judge, I don't know that there

24   is a ballistic difference.  I believe that the import of

25   the evidence, as it's being proffered by the government,
```

USA V. M. RONCONE

1

11:58:01  2    is it's not something a civilian is supposed to have.

11:58:04  3    It says right on the front that it's not for resale.

11:58:07  4    The defendant is not a member of the U.S. Marshal

11:58:10  5    Service or the Department of Homeland Security and he

11:58:12  6    has come into possession of this.  It shows that some

11:58:17  7    sort of connection to obtain something from the

11:58:19  8    government that he shouldn't be able to obtain, that is

11:58:22  9    the proffer I'm giving, not that it's some sort of

11:58:26  10   ballistically dangerous ammunition.

11:58:41  11          And if we could go to H-5, Ms. Champoux.

11:58:47  12          Judge, this is also seized from the

11:58:49  13   defendant's residence, that is the residence in Buffalo

11:58:51  14   that he shares with his father.  There is a Social

11:58:56  15   Security card and a driver's license in the name of

11:59:02  16   another individual.  And so I'm not proffering that I

11:59:05  17   know who that individual is and I do not know why it's

11:59:08  18   there, but I would submit to the Court that possessing

11:59:10  19   identification documents of an individual other than

11:59:13  20   yourself can certainly indicate to the Court that there

11:59:16  21   is a potential for a risk of flight.

11:59:19  22          THE COURT:  I read this in the transcript in

11:59:20  23   front of Judge Schroeder.  The government is not

11:59:22  24   suggesting that it's Mr. Roncone's photograph on the

11:59:25  25   driver license, is it?

1                    USA V. M. RONCONE

11:59:27   2          MR. COOPER:  No, Judge.  But, no, I'm not

11:59:33   3    proffering that, Judge.

11:59:35   4          THE COURT:  Okay.

11:59:36   5          MR. COOPER:  And I think that goes to risk

11:59:38   6    of flight.  It's the government's position that based on

11:59:41   7    everything that has been put before your Honor and that

11:59:44   8    certainly goes outside of the confines of the four

11:59:47   9    corners of the Complaint that we've proven to your Honor

11:59:50   10   by a preponderance of the evidence that the defendant

11:59:53   11   poses a risk of flight that no condition or combination

11:59:56   12   of conditions could reasonably assure his return to

11:59:59   13   court.  I know that Judge Schroeder, and I'm sure your

12:00:01   14   Honor would ask that Judge Schroeder indicated a

12:00:04   15   $100,000 bond and that is the defendant put up his

12:00:08   16   house.

12:00:08   17          I would point out for the Court that in the

12:00:10   18   Pretrial Services Report, there is an indication that he

12:00:14   19   has over $100,000 sitting in a bank account.  So that

12:00:17   20   amount of money, that dollar amount can mean different

12:00:21   21   things to different people.  So a defendant with access

12:00:23   22   to large amounts of money doesn't have the same tie to a

12:00:28   23   residence based upon a $100,000 bond.

12:00:31   24          I would argue to the Court, as I argued last

12:00:35   25   week with Mr. Barnes, when you're a member of an

USA V. M. RONCONE

organization like this that is closely associated with
the Outlaws and has an international presence, if they
need to get someone out of town, they have the ability
in a way of defendants who are not members of
organizations like this don't have the ability.  There
is the ability to go anywhere in the country, clubhouses
all over.  If that is in the best interest of the
Outlaws and the best interest of this defendant, I would
submit to the Court he would have no trouble doing so.

We have to prove preponderance for a risk of
flight.  With respect to the fact that the defendant
poses a danger to the community or any other person, the
burden is clear and convincing evidence.  I would submit
to the Court that the totality of the Government's
proffer, not looking at individual items in isolation,
but looking at everything as a whole, paints a picture
that is clear and convincing that the defendant, due to
his role in this organization and his nexus to Quinn's
death, poses a danger to the community.

THE COURT:  Do you have any proffer of any
acts of violence committed by the Rare Breed Motorcycle
Club?

MR. COOPER:  Not that I can get into today,
Judge, not that I'm willing to proffer at this time.

1                          USA V. M. RONCONE

12:02:11   2              THE COURT:  Okay.  Anything else?

12:02:13   3              MR. COOPER:  No.  Thank you for listening.

12:02:15   4   I appreciate it.

12:02:16   5              THE COURT:  Thank you.

12:02:18   6              Why don't we take a break?  Plan on an about

12:02:20   7   a 10-minute break and we'll resume shortly.  Thank you.

12:02:20   8              (Whereupon, there was a break in the

12:17:42   9   proceeding.)

12:17:42  10              THE COURT:  All right.  We are back on the

12:17:44  11   record.  Note the presence of all counsel and Mr.

12:17:46  12   Roncone.

12:17:47  13              Mr. Dell, are you ready to proceed?

12:17:49  14              MR. DELL:  Yes, your Honor.  I am going to

12:17:53  15   be very brief, your Honor.

12:17:55  16              THE COURT:  That is before you've heard my

12:17:57  17   questions, right?

12:17:58  18              MR. DELL:  Okay.  We heard a relatively

12:18:03  19   lengthy proffer with disturbing allegations.  What we

12:18:07  20   did not hear was a lot about Mr. Roncone himself.  What

12:18:12  21   we heard were allegations of guilt by association from

12:18:18  22   what is, as of now, uncharged crimes.  And we heard

12:18:24  23   allegations of guilt by association with motorcycle

12:18:28  24   clubs.  What we do have, we have a 40-year-old with no

12:18:34  25   criminal history, life-long residence of Western New

1              USA V. M. RONCONE

12:18:38  2  York, who is employed, who has retained an attorney.  I

12:18:43  3  would note that the funds listed in the Pretrial

12:18:47  4  Services Report, that is mostly a settlement for the

12:18:49  5  house that was burned down, that is the source of the

12:18:52  6  funds.  But, in any event --

12:18:55  7              THE COURT:  You mean the money that is in

12:18:56  8  the M&T savings account?

12:19:00  9              MR. DELL:  Correct, your Honor.

12:19:01  10             He lives with his father who is in the

12:19:04  11 courtroom and --

12:19:06  12             THE COURT:  His father is here.  His father

12:19:10  13 has appeared at a number -- I recognize his father.

12:19:17  14             MR. DELL:  Okay, yes, that is his father.

12:19:18  15             THE COURT:  I believe he has attended

12:19:21  16 proceedings in connection with the Kingsmen matter, if I

12:19:26  17 am recognizing him.  I mean, I am familiar with him.

12:19:32  18             MR. DELL:  Okay.  He is willing to post his

12:19:34  19 house that he owns free and clear.

12:19:38  20             THE COURT:  His father owns the house free

12:19:40  21 and clear?

12:19:40  22             MR. DELL:  Correct, your Honor.

12:19:41  23             THE COURT:  And the value of that?

12:19:44  24             Because I know Judge Schroeder had set the

12:19:49  25 $100,000 bail amount and was anything done to, I

```
 1                    USA V. M. RONCONE
```

12:19:55  2  guess --

12:19:56  3        MR. DELL:  What happened, your Honor, was I

12:19:58  4  think the day later, that day or the next day, I

12:20:01  5  received an e-mail from the U.S. Attorney's Office

12:20:03  6  asking for a number of documents and I obtained those

12:20:07  7  from Mr. Roncone and forwarded them.  I don't remember

12:20:10  8  exactly what docket or, I mean, what document it was.

12:20:13  9  It listed it as a $177,000.

12:20:18  10        THE COURT:  $177,000.

12:20:20  11        MR. DELL:  Correct, your Honor.

12:20:21  12        THE COURT:  The value of the home?

12:20:23  13        MR. DELL:  Correct.

12:20:23  14        THE COURT:  And do you have any information

12:20:25  15  about that?

12:20:25  16        MR. COOPER:  Judge, I do.  Kathy Reimen from

12:20:28  17  the U.S. Attorney's is in charge of assessing that and I

12:20:31  18  believe I saw an e-mail yesterday from her indicating

12:20:34  19  that there was sufficient equity in the property.

12:20:37  20        THE COURT:  To secure the $100,000 bail that

12:20:42  21  Judge Schroeder set?

12:20:43  22        MR. COOPER:  That's correct.

12:20:44  23        THE COURT:  Your point in your argument, Mr.

12:20:47  24  Cooper, was that Mr. Roncone has significant assets

12:20:50  25  above and beyond the value of his father's home, right?

```
                        USA V. M. RONCONE
12:20:54   2            MR. COOPER:  Yes, Judge.
12:20:55   3            THE COURT:  The e-mail referred to by Mr.
12:21:00   4   Cooper was confirming that the U.S. Attorney's Office
12:21:03   5   has accepted that house as surety if these conditions of
12:21:10   6   release remain.
12:21:11   7            MR. DELL:  And I also know that the
12:21:13   8   Probation Department went to the house yesterday and
12:21:17   9   it's been approved by the Probation Department as well.
12:21:21  10            THE COURT:  Is that correct?
12:21:22  11            PROBATION:  That's correct, your Honor.
12:21:24  12            MR. DELL:  So I submit that he is not a
12:21:29  13   flight risk.  And I also point to the other conditions,
12:21:33  14   which includes a GPS monitor.  Mr. Roncone has no
12:21:37  15   problem with that, so the government will have access to
12:21:41  16   knowing where he is at all times.
12:21:44  17            As with regard to the guns, which were all
12:21:50  18   legally possessed, as far as I know, apart from the
12:21:54  19   charge in this case, they've all been taken and my
12:22:00  20   understanding is a condition of release, there will be
12:22:02  21   no guns in the home.
12:22:05  22            THE COURT:  Well, he resides with his
12:22:07  23   father.  I guess one of the things that was not
12:22:09  24   addressed by Judge Schroeder is whether or not the
12:22:14  25   father has any firearms in the home, I guess, separate
```

                                USA V. M. RONCONE

12:22:18   2   and apart from what was seized.  I guess we're assuming

12:22:21   3   no since presumably everything was seized.

12:22:25   4                MR. DELL:  Well, probation did check the

12:22:27   5   house and I'm assuming there were no firearms in the

12:22:29   6   house.  And the father certainly understands that if his

12:22:33   7   son is released to that house, that there are to be no

12:22:37   8   firearms, even though they have both been lifetime

12:22:40   9   hunters, but there will be no firearms in the house.

12:22:43   10               THE COURT:  And has probation confirmed

12:22:45   11   that?

12:22:46   12               PROBATION:  Yes, your Honor.  I received an

12:22:47   13   e-mail from the officer that did the home inspection and

12:22:50   14   he reported that the defendant's father reports that all

12:22:54   15   28 firearms were removed from the residence.  It does

12:22:58   16   not state specifically if they were, but it says no

12:23:02   17   weapons were observed by the officer who did the home

12:23:05   18   inspection.

12:23:05   19               THE COURT:  Okay.

12:23:08   20               PROBATION:  It was not in plain view.

12:23:10   21               THE COURT:  Okay.  Do you want to address

12:23:14   22   what I would characterize as some of the more serious

12:23:17   23   allegations involving an alleged communication between

12:23:21   24   your client and Mr. Knight where a photograph of a

12:23:25   25   federal witness who is now deceased was sent.

1                              USA V. M. RONCONE

12:23:28  2              MR. DELL:  I did speak to him about that and

12:23:30  3   he acknowledges the conversation and what he tells me is

12:23:35  4   during the conversation, he did -- he did like a Google

12:23:40  5   search for Crystal Quinn and came up with a Facebook

12:23:44  6   profile and took a screen shot and sent it and basically

12:23:48  7   said, is this who you're talking about?

12:23:54  8              THE COURT:  Okay.  But I guess the

12:23:57  9   circumstances are concerning.

12:24:01  10             MR. DELL:  I understand inferences can be

12:24:03  11  made, but at the same time, in real life, I think people

12:24:07  12  are always communicating with their smart phone with

12:24:11  13  their friends and with their associates and they talk

12:24:14  14  about things that are in the news and things that

12:24:17  15  happen.  And if a friend of his tells him, hey, the feds

12:24:23  16  talked to me today, you know, about this person, I don't

12:24:28  17  think that is necessarily an inference of any relation

12:24:34  18  to the incident.

12:24:35  19             THE COURT:  Well, but what the government is

12:24:37  20  representing is that Mr. Roncone, in his leadership

12:24:40  21  position with the Rare Breed Motorcycle Club, was the

12:24:45  22  recipient of updates from and reports from members of

12:24:51  23  the organization about the government's investigation.

12:24:54  24  And when they were interviewed, they would report to Mr.

12:24:57  25  Roncone and then he would report to the alleged

                              1              USA V. M. RONCONE

12:25:03    2    international president of the Outlaws Motorcycle Club

12:25:06    3    who the government believes was involved in arranging,

12:25:11    4    essentially, for a hit on this federal witness.

12:25:16    5              MR. DELL:  So from what we hear today, such

12:25:19    6    speculation can be made.

12:25:21    7              THE COURT:  I think it's more than

12:25:22    8    speculation.  I think that what has been proffered is

12:25:25    9    more than speculation.  I mean, you can -- it's

12:25:29   10    circumstantial evidence.  Is it compelling

12:25:32   11    circumstantial evidence, I guess I don't know, but it's

12:25:36   12    circumstantial evidence that there are communications

12:25:39   13    between your client and individuals who were being

12:25:46   14    investigated by law enforcement about the death of this

12:25:48   15    witness.  And then he was communicating with an

12:25:53   16    individual who has at least been proffered in other --

12:25:58   17    in another detention hearing, had been meeting with Mr.

12:26:01   18    Gerace who allegedly had the motive to arrange for this

12:26:05   19    woman to be killed.

12:26:07   20              MR. DELL:  He certainly knows these people,

12:26:09   21    your Honor.  And when important events are going on like

12:26:13   22    that, one talks to the people that they know.  But

12:26:16   23    importantly, there has been no nexus proffered by the

12:26:20   24    government.  There is nothing placing -- there is

12:26:22   25    nothing proffered placing Roncone at this poker game

|  | 1 | USA V. M. RONCONE |
|---|---|---|
| 12:26:25 | 2 | that was discussed, nor Gogolack's residence. |
| 12:26:31 | 3 | THE COURT:  The Akron, New York residence, |
| 12:26:34 | 4 | where is that?  Because I don't think Akron is near |
| 12:26:38 | 5 | Wellsville, but maybe I'm wrong.  But he reported to |
| 12:26:43 | 6 | Pretrial Services that he resided at this Akron, New |
| 12:26:47 | 7 | York residence. |
| 12:26:48 | 8 | MR. DELL:  That is not the residence that |
| 12:26:50 | 9 | burned down.  The residence that burned down was on |
| 12:26:53 | 10 | Scott, 42 Scott Avenue. |
| 12:27:01 | 11 | Who did you live with on Akron. |
| 12:27:03 | 12 | THE DEFENDANT:  An ex-girlfriend.  That is |
| 12:27:05 | 13 | where I lived prior to my parents. |
| 12:27:08 | 14 | MR. DELL:  When the house burned down, he |
| 12:27:10 | 15 | move in with an ex-girlfriend. |
| 12:27:14 | 16 | THE COURT:  When did the house burn down on |
| 12:27:14 | 17 | -- |
| 12:27:16 | 18 | THE DEFENDANT:  I lived in Akron well before |
| 12:27:21 | 19 | Wellsville. |
| 12:27:22 | 20 | MR. DELL:  So you were back and forth. |
| 12:27:23 | 21 | THE DEFENDANT:  It was a back and forth. |
| 12:27:25 | 22 | And then after that was over, I moved in with my parents |
| 12:27:28 | 23 | and then I got a job down in Wellsville and I relocated |
| 12:27:32 | 24 | there. |
| 12:27:32 | 25 | MR. DELL:  I don't know if you can hear |

                            USA V. M. RONCONE

12:27:34  2  that, your Honor.

12:27:37  3              THE COURT:  Yes, I did.

12:27:39  4              Did you get that, Karen?

12:27:42  5              COURT REPORTER:  Yes.

12:27:42  6              THE COURT:  So is your client admitting that

12:27:44  7  he lived in the clubhouse in Wellsville, that you lived

12:27:48  8  in?

12:27:49  9              MR. DELL:  They held the meeting in his

12:27:53  10  residence until it burned down.

12:27:55  11              THE COURT:  How long did he live in

12:27:57  12  Wellsville.

12:27:57  13              MR. DELL:  For about four years, I believe.

12:28:00  14              THE COURT:  And I'm just having trouble

12:28:02  15  following.  Okay.  He reported he lived with his

12:28:08  16  parents, he lived at this Wellsville, 42 Scott Avenue

12:28:12  17  for four years.

12:28:13  18              MR. DELL:  That is the one that burned down.

12:28:15  19              THE COURT:  But relocated after a house

12:28:20  20  fire.  When you say you lived in Akron, New York for

12:28:23  21  three years prior to that, you mean prior to the house

12:28:26  22  fire?

12:28:27  23              THE DEFENDANT:  No, prior to ever moving to

12:28:29  24  Wellsville, your Honor.

12:28:30  25              THE COURT:  Okay.  So you lived with a

USA V. M. RONCONE

12:28:32  girlfriend for three years, moved to Wellsville for four

12:28:36  years, and then you move in with your parents or your

12:28:39  dad.

12:28:39          THE DEFENDANT:  There was a brief period I

12:28:41  stayed with my family between Akron and Wellsville.

12:28:46          THE COURT:  Okay.

12:28:52          PROBATION:  Judge, I'm looking at the notes

12:28:55  from the officer that did the interview, and that

12:28:58  appears to be a little bit easier to read than what is

12:29:02  in the paragraph.  It appears he lived in Wellsville for

12:29:05  four years, he is currently with his dad after the house

12:29:08  fire, lived there for four years, but prior to that was

12:29:13  with his parents for a year and before that was at the

12:29:16  address in Akron with the girlfriend.  I think it's

12:29:19  chronologically going backwards, if that makes more

12:29:22  sense.

12:29:23          THE COURT:  Yeah, it does.  Thank you,

12:29:24  Officer Whitcomb.

12:29:25          PROBATION:  Yes, Judge.

12:29:27          THE COURT:  Do you want to address the drugs

12:29:42  at all that were apparently found in the residence?

12:29:47          MR. DELL:  Just to say, you already talked

12:29:48  about marijuana yourself.

12:29:51          THE COURT:  I'm not talking about the

```
                              USA V. M. RONCONE
12:29:52  2   marijuana, I'm talking about the cocaine.
12:29:53  3              MR. DELL:  As far as the cocaine --
12:29:55  4              THE COURT:  Or alleged cocaine.
12:29:56  5              MR. DELL:  That is a Penal Law 220.  It's
12:30:00  6   very trace, very trace amounts.  I would say it could be
12:30:06  7   consistent with what he said in pretrial that he
12:30:11  8   occasionally used, last time six months ago.  I would
12:30:14  9   note that it was on a tray in a locked safe.  I would
12:30:18  10  also note that it was actually his dad's credit card
12:30:21  11  that was on the tray, not his.  It said "James Roncone."
12:30:27  12  But I don't know what else to say.
12:30:34  13             As far as the merits of the present case, I
12:30:38  14  mean, how do you define a drug user?  I submit he was up
12:30:46  15  front with pretrial.  But as far as the danger to the
12:30:51  16  community, I mean, the guns would no longer be in the
12:30:55  17  house anyway, your Honor.
12:30:57  18             THE COURT:  All right.  Anything else, Mr.
12:30:58  19  Dell?
12:30:59  20             MR. DELL:  No, your Honor.
12:30:59  21             THE COURT:  Let me ask probation, your
12:31:02  22  recommendation is release with these conditions.  Is
12:31:05  23  that still after hearing the proffers by in front of
12:31:10  24  both Schroeder and in front of me by the government, is
12:31:14  25  that still probation's recommendation?
```

                    USA V. M. RONCONE

12:31:18    2        PROBATION:  Judge, I don't know the

12:31:19    3   information that was proffered before Judge Schroeder,

12:31:22    4   but clearly conditions were set by that judge after

12:31:25    5   hearing the detention the proffers at the detention

12:31:29    6   hearing.  Given the information that was proffered here

12:31:32    7   today, I think there are some things that would maybe

12:31:35    8   raise some concern to think about it even a little bit

12:31:39    9   more even after what his defense counsel said, maybe

12:31:43   10   that credit card, I almost would question whether or not

12:31:47   11   the father is in his house using drugs, whether or not

12:31:50   12   that is an appropriate residence.  If his father is also

12:31:53   13   a drug user, if we need to consider a different address

12:31:56   14   for release.  But I don't necessarily think that those

12:32:03   15   conditions are outlandish, Judge.

12:32:08   16        THE COURT:  Is there a different address

12:32:10   17   that Mr. Roncone could reside at?  I guess it's not

12:32:14   18   clear to me, Mr. Dell, are we suggesting that Mr.

12:32:20   19   Roncone, the father, is the drug user and therefore --

12:32:23   20        MR. DELL:  I guess this is what -- it was

12:32:25   21   such a small amount and it was locked in the safe.  I

12:32:28   22   represent individuals in Federal Court all of the time

12:32:32   23   with drug trafficking charges, and they are released to

12:32:38   24   their homes, sometimes the home is searched.

12:32:41   25        THE COURT:  Not usually with a number of

USA V. M. RONCONE

12:32:43  2   firearms, though.  In other words, oftentimes, let's

12:32:47  3   face it, oftentimes in those circumstances, you probably

12:32:50  4   have some kind of -- I mean there would be suspicion

12:32:54  5   that they are a drug trafficker and even if just trace

12:32:57  6   amounts of drugs are found with that number of firearms,

12:33:00  7   you probably would have a 924(c) charge, which we

12:33:04  8   obviously don't have here.

12:33:05  9          MR. DELL:  No.  And the firearms are no

12:33:08  10  longer there, your Honor.

12:33:11  11         THE COURT:  What about the drugs though?  I

12:33:13  12  mean, in other words, I think the question I have is is

12:33:20  13  Mr. Roncone's father willing to -- sometimes we'll have

12:33:28  14  third-party representations that -- and I'm not stating

12:33:36  15  it correctly -- but if he is going to be residing with

12:33:41  16  his father, if that is the proposal, what

12:33:43  17  representations is his father willing to make about

12:33:46  18  what's going to be at the house, what is the conduct and

12:33:49  19  behavior that is going to be at the house.

12:33:51  20         THE COURT:  He is here and I believe he will

12:33:53  21  represent that there will be no guns and no drugs in

12:33:56  22  that house.

12:33:58  23         THE COURT:  Well, would he be able to swear

12:34:00  24  under oath to that?  Would he be willing to do that?

12:34:04  25         MR. DELL:  Yes, your Honor.

USA V. M. RONCONE

12:34:13  2    PROBATION:  Judge, what you're referring to

12:34:16  3    the third-party custodian.

12:34:17  4    THE COURT:  Right.

12:34:18  5    PROBATION:  And the other thing, to some of

12:34:21  6    the other concerns I thought were raised, maybe also

12:34:23  7    addressed with computer monitoring regarding any type of

12:34:27  8    communications if that was also a concern, we do have

12:34:30  9    that condition available as well.

12:34:32  10    THE COURT:  Similar to what is imposed in

12:34:35  11    child pornography cases, essentially.

12:34:37  12    PROBATION:  Correct.  We could monitor

12:34:39  13    communications, any pictures submitted or text messages

12:34:45  14    of any nature.

12:34:46  15    THE COURT:  What is the defendant's position

12:34:47  16    on that?

12:34:48  17    MR. DELL:  He is fine with that, your Honor.

12:34:54  18    THE COURT:  And does probation -- I think

12:34:55  19    Judge Schroeder just set release was subject to

12:35:02  20    probation's preference in terms of the monitoring, but

12:35:06  21    indicated that it would be set by probation.

12:35:10  22    Officer Whitcomb, do you have --

12:35:14  23    PROBATION:  I'm looking at the order right

12:35:15  24    now.  Curfew to be set by the probation office and it is

12:35:19  25    GPS monitoring.

1                    USA V. M. RONCONE

12:35:21   2         THE COURT:  And you're not suggesting

12:35:23   3   anything more significant or restrictive?

12:35:27   4         PROBATION:  I mean, home detention might be

12:35:30   5   more appropriate to start, Judge.  And with a period of

12:35:34   6   compliance, you know, move to curfew if that would

12:35:38   7   alleviate concerns.

12:35:39   8         THE COURT:  What is the defendant's position

12:35:41   9   on that, Mr. Dell?

12:35:42  10         MR. DELL:  He is fine with it.  What he just

12:35:44  11   asked me, he is concerned that he wants to be able to go

12:35:47  12   to work.

12:35:48  13         THE COURT:  Home detention allows the

12:35:49  14   individual to work, go to medical appointments, you just

12:35:52  15   have to coordinate it with the probation office.

12:35:56  16         MR. DELL:  That's fine, your Honor.

12:36:04  17         THE COURT:  One question I have is, I know

12:36:10  18   in having sentenced individuals who were convicted of

12:36:16  19   racketeering activity related to motorcycle

12:36:21  20   organizations, that there is typically a condition of

12:36:24  21   release included in the sentence that they have to avoid

12:36:30  22   any association with motorcycle organizations, including

12:36:35  23   wearing the patching and so forth.  Now, that is not

12:36:37  24   part of the proposed conditions from probation and there

12:36:45  25   is a condition that you have to avoid all contact with

USA V. M. RONCONE

12:36:48 co-defendants and defendants in related cases unless

12:36:52 approved by pretrial services.  But, there is not that

12:36:56 proposed condition that you have as part of supervised

12:37:02 release.

12:37:02             PROBATION:  Judge, we can certainly add that

12:37:04 as a special condition that he not be affiliated with

12:37:07 any motorcycle clubs during the term of pretrial

12:37:12 supervision.  But him residing at his father's address,

12:37:15 I think, would also make that difficult.  If there is

12:37:17 any other items in the residence, his father would have

12:37:22 to agree to that as well.

12:37:24             THE COURT:  Mr. Dell, what is the

12:37:25 defendant's position on that?

12:37:29             MR. DELL:  They are both agreeable to that,

12:37:31 your Honor.

12:37:34             THE COURT:  All right.  Anything else from

12:37:35 the defense.

12:37:36             MR. DELL:  No, your Honor.

12:37:37             THE COURT:  Mr. Cooper, anything else from

12:37:38 the government?  I'll tell you what I'm thinking of

12:37:44 doing.  I'm thinking of taking another break and I'll

12:37:47 probably put a decision on the record.  So, speak now or

12:37:50 forever hold your peace.

12:37:52             MR. COOPER:  Judge, just, I guess, my final

USA V. M. RONCONE

12:37:57   2  couple of points would be, first of all, that that

12:38:00   3  Wellsville address on Scott Avenue, just so the Court is

12:38:05   4  aware, Scott Avenue is the same street that Crystal

12:38:08   5  Quinn was found dead on.  It's in very close spacial

12:38:12   6  proximity, just to point that out, because it may not

12:38:15   7  have been apparent to your Honor.  The next thing --

12:38:17   8          THE COURT:  Do you know the address where

12:38:19   9  she was found?

12:38:19  10          MR. COOPER:  296 Scott Avenue, but it's -- I

12:38:24  11  can represent to your Honor, that is not like a very

12:38:27  12  long street or very large area geographically, so it's

12:38:31  13  within minutes walking of that location.  So close to

12:38:37  14  Gogolack.  That is where the defendant was living for

12:38:38  15  years before the house burned down.

12:38:41  16          THE COURT:  But he wasn't living there at

12:38:42  17  the time --

12:38:43  18          MR. COOPER:  Absolutely.

12:38:43  19          THE COURT:  -- that she died?

12:38:46  20          MR. COOPER:  Correct, Judge.  And the other

12:38:48  21  thing I would point out, it's the government's position

12:38:50  22  there are no condition or combination of conditions and

12:38:54  23  that home detention with GPS does not prevent flight

12:38:57  24  from a person who is determined to flee.  The GPS

12:39:02  25  monitors come off when a person wants them off.  And so

```
          1              USA V. M. RONCONE
12:39:05  2   I'm not being, obviously, not intending to be
12:39:09  3   disrespectful to probation or to their position, but
12:39:12  4   it's the government's position that that does not ensure
12:39:16  5   a person's return to not to flee and this person has the
12:39:23  6   financial means and organizational ties to be able to so
12:39:23  7   that.
12:39:29  8              THE COURT:  All right.  Thank you, Mr.
12:39:30  9   Cooper.  Let's take a -- why don't we resume back here
12:39:33 10   at 1 o'clock, if we can, and I'll announce what my
12:39:39 11   decision is.
12:39:39 12              (Whereupon, here was a break in the
12:39:39 13   proceeding.)
13:10:53 14              Remind me, Mr. Cooper, what the potential
13:10:56 15   maximum penalty is for the crime that Mr. Roncone is
13:10:59 16   facing.
13:11:00 17              MR. COOPER:  Fifteen-year statutory maximum
13:11:04 18   under, I believe, section 922(G) was amended recently to
13:11:09 19   increase the statutory minimum from 10 to 15 years.
13:11:12 20              THE COURT:  I knew it was amended for felon
13:11:14 21   in possession of a firearm.  It also applies for any
13:11:18 22   922(g)?
13:11:19 23              MR. COOPER:  I just -- I researched it
13:11:23 24   recently.  I believe that was the answer I came up with.
13:11:26 25              THE COURT:  Do you agree with it, Mr. Dell?
```

|     |                                              |
|-----|----------------------------------------------|
| 1   | USA V. M. RONCONE                            |

13:11:29  2    MR. DELL:  I don't disagree with it, but I'm

13:11:33  3  not certain.

13:11:33  4    MR. COOPER:  I can check.

13:14:48  5    THE COURT:  Confirming it is 922(g).

13:14:52  6    MR. COOPER:  So in Title 18 U.S.C. Section

13:14:57  7  924(a)(6)(B), I believe, is the -- I'm sorry, not (6)(B)

13:15:13  8  924(a)(8).  I'm sorry, Judge.  "Whoever knowingly

13:15:15  9  violates subsection (d) or (g) of section 922 should be

13:15:21  10  fined under this title, imprisoned for not more than 15

13:15:24  11  years or both."  And there is not any specification --

13:15:27  12    THE COURT:  Of subsection of (g).

13:15:28  13    MR. COOPER:  So it covers (g) entirely.

13:15:30  14    THE COURT:  Okay.  That makes sense.

13:15:40  15    All right.  So thank you, everybody for your

13:15:45  16  presentations.  So I'm ready to put a decision into the

13:15:49  17  record.

13:15:49  18    The Bail Reform Act of 1984, which is

13:15:53  19  statutorily found at 18 or codified at Title 18 U.S.C.

13:15:59  20  Section 3141, *et seq*, authorizes and sets forth the

13:16:04  21  procedures for the release or detention of a person

13:16:06  22  pending trial, sentence and appeal.  The procedures and

13:16:10  23  standards for release or detention of a person, such as

13:16:13  24  Mr. Roncone, pending trial, are set forth at 18 U.S.C.

13:16:18  25  Section 3142.  A defendant awaiting trial must be

USA V. M. RONCONE

released unless the release will present a risk of flight or dangerousness or both, and no set of conditions can reasonably eliminate those risks.

Although there is only a limited group of offenders who should be denied bail pending trial, when there is "a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate." *United States v. Chimurenga*, 760 F. 2d 400 page 403, Second Circuit case from 1985.

At all times the government retains the ultimate burden of persuasion. The burden of proof with respect to risk of flight is preponderance of the evidence. On the other hand, the government must demonstrate by clear and convincing evidence that a defendant should not be released due to his risk of danger. Clear and convincing evidence means something more than preponderance of the evidence and something less than beyond a reasonable doubt. In other words, the evidence must support a conclusion of danger to the community with a high degree of certainty.

In reviewing a detention order of a magistrate judge, such as I'm doing here, a district

USA V. M. RONCONE

2  judge should not simply defer to the judgment of the

3  magistrate judge but rather must reach their own

4  independent conclusion.  When making a *de novo* review, a

5  district judge may rely on the record of the proceedings

6  before the magistrate judge and may also accept

7  additional evidence.

8           So there are four factors under 3142(g) that

9  I must consider when determining whether or not

10  sufficient conditions could protect against any

11  potential risk of flight or risk of danger.  The first

12  factor considers the nature and circumstances of the

13  offense charged, including whether the offense is a

14  crime of violence or whether the offense involves a

15  firearm.  The second factor is the weight of the

16  evidence.  The third factor to be considered is the

17  history and characteristics of the person, including the

18  person's character, physical and mental condition,

19  family ties, employment, financial resources, length of

20  residence in the community and community ties, past

21  conduct, history relating to drug or alcohol abuse,

22  criminal history, record concerning appearances in court

23  proceedings, and whether or not the defendant was on

24  parole, probation or release at the time of the offense.

25           And then the fourth factor to be considered

USA V. M. RONCONE

is the nature and seriousness of the danger to any
person or the community that would be posed by the
person's release.  Just addressing some of the case law
before I get into the specifics of the facts here.
Well, Mr. Tripi, the other day at Mr. Ermin's detention
proceeding cited the case of *United States v. Cerillo,*
149 F. Appx. 40, Second Circuit case from September of
2005, in support of the notion that it would be
appropriate to detain somebody if there is proof that
that person has a leadership role in an organization and
there is proof that the organization engages in acts of
violence.  I don't disagree with that general notion,
but I would note for the record, in that case, the
defendant was indicted on substantive and conspiratorial
charges of racketeering.  And to give an example of the
kind of proof that was presented that the Second Circuit
found sufficient under those circumstances, there was
testimony of an FBI agent with particular expertise in
the Genovese crime family, which was at issue in that
case.  There was corroborative recorded conversations
among organized crime members.  There was a list of
potential new members of the Genovese family recovered
from the defendant's home on the date of the arrest.
There was the government's proffer of the existence of

USA V. M. RONCONE

anticipated trial evidence, including testimony from seven cooperating witnesses, a host of surveillance photographs and transcripts of recorded conversations.

There is also a number of other Second Circuit cases that have dealt with detaining a defendant who has a leadership role in a criminal enterprise and there is proof that that criminal enterprise or just enterprise, even, for that matter, was engaged in acts of violence. And I have a summary of those cases in a decision I issued in *United States v. Enix*, 209 F. Supp 3d 557, Western District of New York from 2016. And the summary is at pages 570 through 572. And I've updated the research since then, and I don't think the general legal premises is any different, that if there is proof that an individual has a leadership role in an organization and there is proof that that organization regularly engages in acts of violence, then that could, even without proof that the defendant himself was engaged in acts of violence, that could constitute clear and convincing evidence of a risk of danger that no conditions could protect against. But, as we know, when I asked Mr. Cooper as to whether or not the government had any proffer of any acts of violence by the Rare Breeds Motorcycle Club, the government does not.

USA V. M. RONCONE

So I think there is clearly proof here that Mr. Roncone had a leadership role in connection with the Rare Breeds Motorcycle Club, that I do find that the government's proffer in that regard is sufficient to establish that. But I do not find that there has been a proffer of acts of violence being engaged in by the Rare Breed Motorcycle Club so that I could conclude, just based on Mr. Roncone's leadership role in the organization, that he presents a risk of danger if released.

Now here, Mr. Roncone is charged with a violation of Title 18 U.S.C. Section 922(g)(3). That charges, we've just confirmed, carries a maximum term of 15 years in prison. And the government has represented that the Sentencing Guidelines would recommend an approximate two to four-year prison sentence. That is a serious charge. I'm not suggesting that it's not a serious charge, but it's certainly not the type of charge that typically results in detention. Instead, the government is focused on the seriousness of the charges that it's investigating to support its contention that detention is warranted here. And while I agree with the government that a court can and should consider evidence outside of the four corners of the

USA V. M. RONCONE

13:24:08  2  Complaint, I disagree that because the government is
13:24:13  3  investigating charges that are serious, as the
13:24:16  4  government suggests is reflected by attachment B to its
13:24:20  5  search warrant, that that means that a defendant should
13:24:23  6  be detained.  In my opinion, that would be turning the
13:24:26  7  Bail Reform Act on its head that just because the
13:24:30  8  government says, well, the charges we are investigating
13:24:33  9  are serious, that then you necessarily detain a
13:24:36  10 defendant.  I don't think that is the proper way to look
13:24:40  11 at evidence outside of what's charged in the Criminal
13:24:44  12 Complaint.  Now, a defendant can be detained based on
13:24:49  13 uncharged conduct, no question about it.  But there has
13:24:52  14 to be evidence to support the conclusion of either a
13:24:58  15 risk of flight or danger to the community.  And so what
13:25:02  16 do we have here?  We have Mr. Roncone, I agree, was a
13:25:07  17 leader of the Rare Breeds Motorcycle Club.  I think the
13:25:11  18 most -- well, let me back up a second.  There is
13:25:16  19 evidence of the number of guns at his residence, that is
13:25:20  20 troubling.  That is a lot of firearms.  When you couple
13:25:23  21 that with the evidence of the drugs in the residence,
13:25:27  22 that certainly indicates criminal conduct.  The most
13:25:33  23 troubling aspect of this, no question about it, is the
13:25:37  24 death of Ms. Quinn and the connection that that death
13:25:42  25 had to the Gerace trial.  There is evidence that has

USA V. M. RONCONE

13:25:50  2  been proffered of a connection between Mr. Gerace and

13:25:54  3  the Outlaws Motorcycle Club, that seems pretty apparent

13:25:58  4  from the number of individuals associated with that club

13:26:00  5  that work at Pharaoh's and the visits that were detailed

13:26:04  6  in the proffer by Mr. Tripi in connection with Mr.

13:26:09  7  Ermin's detention hearing of Mr. Ermin visiting Mr.

13:26:14  8  Gerace at the jail.  There is clearly a relationship

13:26:17  9  between the Outlaws Motorcycle Club and the Rare Breed

13:26:21  10 Motorcycle Club.  From all, what it appears, it's a

13:26:24  11 feeder club to the or support club of the Outlaws

13:26:30  12 Motorcycle Club.  There is a connection between the Rare

13:26:33  13 Breed Motorcycle Club and Pharaoh's based on the proffer

13:26:37  14 from Mr. Cooper.  And I'm deeply troubled, to be up

13:26:43  15 front with you, about these communications between Mr.

13:26:48  16 Roncone and Mr. Knight on August 3rd, and subsequent

13:26:54  17 communications between Mr. Roncone with Mr. Ermin at

13:27:01  18 times, and it's not specific, and the government hasn't

13:27:04  19 been specific about it, and I'm not -- let me be clear.

13:27:09  20 I'm not criticizing the government.  I appreciate that

13:27:12  21 you're in the midst of a realtime investigation and

13:27:15  22 you're also trying to get ahead of it by trying to

13:27:20  23 detain certain individuals, but it's not specific, but

13:27:24  24 there is at least some evidence in the record of

13:27:27  25 communications between Mr. Roncone and Mr. Ermin that is

USA V. M. RONCONE

13:27:37  2  temporarily close in time to significant events during

13:27:39  3  the government's investigation.  And that is concerning.

13:27:45  4  No question about it.

13:27:49  5           And the text messages that Mr. Cooper read

13:27:51  6  into the record from Ms. Quinn to both Mr. Gogolack and

13:27:56  7  then to this person who was in her contacts who she was

13:28:01  8  texting the wrong number, that certainly seems to

13:28:04  9  suggest that during the early morning hours of July

13:28:07  10 28th, she was indicating that she thought there was a

13:28:13  11 risk of danger to her and potentially Mr. Gogolack from,

13:28:20  12 I think, no question, members of the Rare Breeds

13:28:24  13 Motorcycle Club.  But there has been no evidence that

13:28:27  14 Mr. Roncone was even in the area at the time or that he

13:28:32  15 was present during any of this.  He has no criminal

13:28:37  16 record.  He is gainfully employed.  He is a lifelong

13:28:42  17 resident of the area.  And I do find, based on my

13:28:46  18 consideration of all of the relevant factors, there is a

13:28:49  19 risk of danger and there is a risk of flight.  No

13:28:52  20 question.  But I do think that sufficient conditions can

13:28:55  21 be put in place to protect against those risks.  And

13:28:59  22 those conditions are as follows.

13:29:02  23           In addition to all of the conditions that

13:29:05  24 Judge Schroeder imposed, I'm going to increase the

13:29:08  25 security that has to be posted to $100,000 secured by

1                        USA V. M. RONCONE

13:29:15    2    Mr. Roncone's father's residence, and $100,000 in cash.

13:29:21    3    I'm going to change the electronic monitoring from a

13:29:25    4    curfew as set by probation.

13:29:32    5              Is there something.

13:29:32    6              PROBATION:  No.

13:29:33    7              THE COURT:  A curfew that is set by

13:29:37    8    probation to home detention.  Mr. Roncone's father has

13:29:43    9    to agree to be a third-party custodian, which means that

13:29:47    10   he is going to accept responsibility for Mr. Roncone,

13:29:52    11   the defendant's, compliance with the conditions of

13:29:56    12   release that have been set in this case, which would

13:29:59    13   include no firearms or drugs in the residence.

13:30:03    14             And I'm going to impose a computer

13:30:06    15   monitoring condition, which means that Mr. Roncone will

13:30:12    16   participate in the computer internet monitoring program

13:30:16    17   administered by the U.S. Probation office.  And then

13:30:20    18   finally, in addition, I'm going to restrict Mr. Roncone

13:30:24    19   from any association and membership with any motorcycle

13:30:29    20   club gang, including, but not limited to the Rare Breeds

13:30:35    21   Motorcycle Club and the Outlaws Motorcycle Club.  This

13:30:38    22   means that he shall not pay dues, attend meetings,

13:30:41    23   participate in mandatory runs or wear the clothing,

13:30:44    24   colors, patch or insignia of any such club.  Further he

13:30:48    25   shall not attend functions sponsored by such clubs, even

USA V. M. RONCONE

if the function is open to citizens, the public.  He

shall remove all insignia or emblems associating him

with the Rare Breeds Motorcycle Club or Outlaws

Motorcycle Club from his home, motorcycle, vehicle or

other property.

And a violation of any of these conditions

would not only result in potential further criminal

prosecution, but, in addition, he would risk forfeiting

the security that has been posted.  In other words, the

security is posted to secure not only his appearance and

attendance at court proceedings, but also his compliance

with these conditions that I would be setting.

Now, if, in fact, the security, the cash

security ends up creating an issue either with

attorney's fees or an issue with respect to living

expenses, defense counsel can always make an

application.  I would want application made to me as

opposed to the magistrate judge since I'm the one that

is setting this condition, but that is what I think is

reasonable under the circumstances here.

Mr. Dell, any questions?

MR. DELL:  Just with regard to that last

bit, I think $100,000 pretty much taps him out.  If the

court would consider making that 80 or 90 so he can have

1                    USA V. M. RONCONE

13:32:30    2    some breathing room.

13:32:31    3                    THE COURT:  I don't think it taps him out

13:32:33    4    based on what is in the Pretrial Services Report.  And

13:32:36    5    if it creates an issue, then come to me and make an

13:32:39    6    application for it.  In other words, I don't know, as I

13:32:42    7    sit here, all I have is in front of me regarding Mr.

13:32:45    8    Roncone's finances is what is included in the Pretrial

13:32:51    9    Services Report.  So he is living with his father, I

13:32:56    10   mean, I mean, the expenses are detailed in the Pretrial

13:33:01    11   Services Report, but they don't amount to anything of

13:33:03    12   any significance.  And that leaves him with, according

13:33:08    13   to this, in my estimation, plenty of cash on hand to

13:33:16    14   survive at least for the foreseeable future, especially

13:33:21    15   since he is employed.  If it ends up being the case, I'm

13:33:25    16   not going to be unreasonable about it.

13:33:27    17                    Any questions, Mr. Cooper?

13:33:28    18                    MR. COOPER:  Just one question, Judge, and I

13:33:31    19   don't work on CB cases at all and so I'm a bit

13:33:36    20   unfamiliar with the computer monitoring condition.  I

13:33:40    21   just wanted to ask a clarification question.  Is it the

13:33:43    22   Court's extension that it extends to cell phones and

13:33:46    23   smart phones, and if so, will there be an additional

13:33:49    24   restriction on possessing or having access to drop

13:33:53    25   phones or burner phones other than the one that is

                              USA V. M. RONCONE

13:33:56  2   monitored by probation?

13:33:58  3            THE COURT:  I would answer that question,

13:34:00  4   but I'm going to turn to Officer Whitcomb here.

13:34:02  5            PROBATION:  Yes.  So the computer monitoring

13:34:05  6   condition covers any devices that has access to the

13:34:09  7   internet that can be monitored by our software.  So the

13:34:13  8   defendant would not be able to have any access to any

13:34:16  9   devices that we cannot monitor.  So his phone that he

13:34:21  10  has, needs to either be a flip phone, per se, that

13:34:26  11  doesn't have access to the internet or it can be an

13:34:29  12  Android or Windows-type smart phone that we can put the

13:34:33  13  monitoring.  There are certain types of operating

13:34:37  14  systems that we cannot monitor and the defendant would

13:34:39  15  not be permitted to possess those devices.  Any devices

13:34:43  16  within the defendant's residence, because he is living

13:34:46  17  with his father, would have to be password protected or

13:34:49  18  in some way either removed from the home so the

13:34:52  19  defendant does not have access to those and we'll check

13:34:56  20  those on a regular basis.

13:34:57  21            THE COURT:  So in response to your question

13:34:59  22  about the burner phone, yes, part of the requirement,

13:35:02  23  there has to be disclosure to the probation office of

13:35:05  24  any computer devices including phones within the

13:35:08  25  defendant's possession or within his access or in the

```
              1              USA V. M. RONCONE
13:35:11      2    home.  Right, Officer Whitcomb?
13:35:13      3              PROBATION:  Yes.  And that is all devices -
13:35:15      4    smart TVs, any type of gaming systems of that nature
13:35:19      5    that do have access to the internet, he would not be
13:35:23      6    able to have access to that whatsoever, and he has to
13:35:26      7    disclose that at the beginning of his supervision.
13:35:29      8              MR. COOPER:  Perfect.  And the follow up on
13:35:32      9    the same subject, I am peripherally familiar with the
13:35:39     10    United States v. Levon Parks where there was a similar
13:35:41     11    condition regarding cell phone usage and some type and a
13:35:44     12    cell phone was ultimately found inside the residence and
13:35:47     13    that defendant, who was residing with a family, and just
13:35:52     14    attributed to the family member.  What is the mechanism
13:35:55     15    to prevent that from happening?
13:35:57     16              THE COURT:  Well, one, I would say is the
13:35:59     17    fact that the only other person in the residence is
13:36:02     18    going to have to be a third-party custodian here.  So,
13:36:06     19    Mr. Roncone, the father, is going to be responsible for
13:36:10     20    ensuring that the defendant complies with these terms
13:36:14     21    and conditions.  So, for instance, hypothetically
13:36:18     22    probation shows up and finds a phone that they are
13:36:22     23    unaware of at the home and there is only two people in
13:36:26     24    the home, then there is no way that there can be any
13:36:30     25    disclaiming of responsibility.  Does that answer your
```

1                    USA V. M. RONCONE

13:36:34   2   question?

13:36:35   3              MR. COOPER:  I guess my concern is that any

13:36:38   4   phone that is not the one that is being monitored, if a

13:36:41   5   phone is discovered, they are going to say that is dad's

13:36:44   6   phone, not mine, and dad's phones are not being

13:36:48   7   monitored.  I'm not trying to be obtuse.

13:36:50   8              PROBATION:  I understand what you are saying

13:36:51   9   as well.  Mr. Roncone, the father, would have to

13:36:54  10   indicate that that phone is password protected and that

13:36:59  11   Mr. Roncone, the defendant, does not have access to that

13:37:03  12   device.  If we show up at the residence and find that is

13:37:06  13   not password protected that or the defendant has access

13:37:09  14   to it, that is a violation of his conditions.

13:37:11  15              MR. COOPER:  And we take -- we're

13:37:13  16   essentially left with the word of the father that he is

13:37:16  17   not accessing it, right?  I understand.  I just want to

13:37:19  18   fully understand.

13:37:20  19              THE COURT:  Yeah.  Is it 100 percent

13:37:23  20   guarantee?  No.  But my view is the fact that $200,000

13:37:28  21   is being posted as security, and I'm saying right here

13:37:32  22   that if these conditions are violated and there is a

13:37:35  23   conclusion that they have been violated and there is

13:37:38  24   going to be a forfeit of the home, potentially, and the

13:37:41  25   $100,000 in cash, I think that is a significant risk

                            USA V. M. RONCONE

13:37:47  2  that either this defendant or his father would be

13:37:49  3  taking.

13:37:51  4          MR. COOPER:  I understand.  I appreciate the

13:37:52  5  explanation about the condition.

13:37:55  6          THE COURT:  Any other questions from the

13:37:56  7  government?

13:37:56  8          MR. COOPER:  No.  Thank you, Judge.

13:37:57  9          THE COURT:  Any other questions, Mr. Dell?

13:37:59  10          MR. DELL:  No, your Honor.

13:38:00  11          THE COURT:  Anything from probation?  I want

13:38:04  12  you to go on the record and state clearly what all of

13:38:07  13  the conditions are.  And, Mr. Roncone, it's important

13:38:11  14  for you to listen to this, Mr. Roncone, you're not

13:38:14  15  seniors, but Mr. Roncone, the father, Mr. Roncone, the

13:38:18  16  defendant, it's important for you to listen to these

13:38:21  17  because you're both going to have an obligation in this

13:38:24  18  regard and you both are going to have a horse in this

13:38:30  19  race, so to speak, if anything is not complied with.  Do

13:38:35  20  you understand?

13:38:35  21          THE DEFENDANT:  Yes, your Honor.

13:38:36  22          THE COURT:  And, Mr. Roncone, you

13:38:37  23  understand?

13:38:39  24          DEFENDANT'S FATHER:  When it comes to these

13:38:41  25  phones like --

```
 1                    USA V. M. RONCONE
```

13:38:42  2          THE COURT:  Why don't you actually, you can

13:38:44  3    come up to the podium here if you would like so I can

13:38:47  4    hear you.  Because it's important, especially if you're

13:38:53  5    going to be a third-party custodian, I want to make sure

13:38:56  6    you understand the conditions.

13:38:59  7          DEFENDANT'S FATHER:  Yes, your Honor.

13:38:59  8          THE COURT:  So tell me your first name.

13:39:04  9          DEFENDANT'S FATHER:  James.  There are old

13:39:05  10   phones in the house, like all of the old phones that are

13:39:11  11   in the house, they are all going, right?

13:39:15  12         THE COURT:  You have a lot of old phones in

13:39:16  13   the house?

13:39:17  14         DEFENDANT'S FATHER:  From the kids growing

13:39:19  15   up.

13:39:20  16         THE COURT:  Officer Whitcomb?

13:39:21  17         PROBATION:  I'll talk with his pretrial

13:39:24  18   officer, but we'll make sure there is either no access.

13:39:27  19   We can assist with removal from the residence.

13:39:30  20         DEFENDANT'S FATHER:  Okay.  They'll come and

13:39:32  21   show me what has to go and everything?

13:39:34  22         PROBATION:  Yes.

13:39:36  23         DEFENDANT'S FATHER:  Yes, very good.

13:39:37  24         THE COURT:  Any other questions?

13:39:38  25         DEFENDANT'S FATHER:  No, ma'am.

1          USA V. M. RONCONE

13:39:39  2          THE COURT:  I'll have Officer Whitcomb read

13:39:41  3  these conditions into the record and I'll first ask your

13:39:44  4  son, but I want to ask you too if you have any questions

13:39:48  5  afterward so make sure you listen when she reads these

13:39:51  6  in.

13:39:52  7          PROBATION:  And it's James Roncone, correct?

13:39:55  8          THE DEFENDANT:  Yes, it is.

13:40:23  9          PROBATION:  The conditions are as follows:

13:40:25 10          The defendant shall not commit any offense

13:40:29 11  in violation of federal, state or local law while on he

13:40:33 12  release in this case.  He must cooperate in the

13:40:35 13  collection of a DNA sample if the collection is

13:40:37 14  authorized by statute.  He shall immediately advise the

13:40:41 15  Court, defense counsel, the U.S. Attorney and the U.S.

13:40:44 16  Probation and Pretrial Services Office in writing before

13:40:47 17  any change in address and telephone number.  And he

13:40:50 18  shall appear at all proceedings as required and shall

13:40:54 19  surrender for service of any sentence imposed as

13:40:57 20  directed.

13:40:58 21          It is further ordered that the release of

13:41:00 22  the defendant is subject to the conditions below.  He is

13:41:04 23  placed in the custody of James Roncone, who agrees to

13:41:08 24  supervise the defendant in accordance with all the

13:41:12 25  conditions of release, to use every effort to assure the

USA V. M. RONCONE

appearance of the defendant at all scheduled court proceedings, and to notify the Court immediately in the event the defendant violates any conditions of release or is no longer in the custodian's custody.

The defendant shall report to the pretrial services office within 24 hours of release and as directed thereafter. He shall execute a bond or an agreement to forfeit upon failing to appear as required the following sum of money or designated property, that being $100,000 in real property secured by the father's residence, and $100,000 cash. He is to surrender any passport or passport card to the Clerk of the Court, and to surrender any other international travel documents to the appropriate authorities. He is not to obtain a passport or any other international travel documents. His travel is restricted to the Western District of New York unless court permission is granted to travel elsewhere. He is to remain at a verifiable address as approved by pretrial services. He is to avoid all contact with co-defendants and defendants in related cases unless approved by pretrial services. He is to refrain from possessing a firearm, destructive device, or other dangerous weapon. He is to refrain from any use of alcohol. He is to refrain from any use or

USA V. M. RONCONE

unlawful possession of a narcotic drug and other
controlled substances defined in Title 21 U.S.C. Section
802 unless prescribed by a licensed medical practitioner
and/or any other mind-altering substances.

The defendant may not use or possess
marijuana regardless of whether the defendant has been
authorized to use or possess medical marijuana under
state law.  He is to submit to any method of testing
required by the pretrial services office or supervising
office for determining whether the defendant is using a
prohibited substance.  Such methods may be used on
random frequency, including urine testing, the wearing
of a sweat patch, a remote alcohol testing system,
and/or any other form of prohibited substance screening
and testing, including copayment.  He is to participate
in a program of inpatient or outpatient substance abuse
and counseling approved by pretrial services.  The
defendant shall contribute to the cost of services
rendered in an amount to be determined by the probation
officer based on ability to pay or availability of
third-party payments.

He is to refrain from obstructing or
attempting to obstruct or tamper in any fashion with the
efficiency and accuracy of any prohibited substance

USA V. M. RONCONE

13:43:59  2  testing or electronic monitoring, which is required as

13:44:03  3  conditions of release.  He is to participate in one of

13:44:06  4  the following location restriction programs and comply

13:44:09  5  with its requirements as directed; that being home

13:44:10  6  detention, meaning he is restricted to his residence at

13:44:14  7  all times, except for employment, education, religious

13:44:17  8  services, medical, substance abuse or mental health

13:44:21  9  treatment, attorney visits, court appearances, court

13:44:24  10  ordered obligations or other activities approved in

13:44:28  11  advance by the pretrial services office or supervising

13:44:31  12  officer.

13:44:32  13       He is to submit to the following location

13:44:35  14  monitoring technology and comply with its requirements

13:44:38  15  as directed, and that being GPS.  He is to pay all or

13:44:42  16  part of the cost of location monitoring based upon his

13:44:45  17  ability to pay as determined by the pretrial services or

13:44:48  18  supervising officer.

13:44:50  19       He is to report within 72 hours to pretrial

13:44:53  20  services any contact with any law enforcement personnel,

13:44:56  21  including, but not limited to, any arrest, questioning

13:44:58  22  or traffic stop.  He is to surrender his pistol permit

13:45:03  23  to the appropriate authorities and he is not to obtain

13:45:06  24  any new pistol permit.  He shall participate in the

13:45:12  25  computer internet monitoring program administered by the

USA V. M. RONCONE

U.S. Probation office.  The defendant must provide the

U.S. Probation office advance notification of any

computers, automated services or connected devices.  The

U.S. Probation office is authorized to install any

application as necessary on computers or connected

devices owned or operated.  The defendant may be

required to pay the cost of monitoring services at a

monthly rate provided by the U.S. Probation office.  The

U.S. Probation Office shall randomly monitor the

defendant's computers, connected devices and/or storage

media.  The defendant shall consent to and cooperate

with unannounced examinations of any computer equipment

owned or used by the defendant, including but not

limited to retrieval and copying of all data from the

computer's connected devices, storage media and any

internal or external peripherals, and may involve

removal of such equipment for the purpose of conducting

a more thorough inspection.

          And he is, the defendant is restricted from

any association or membership with any motorcycle club

or gang including but not limited to the Rare Breed

Motorcycle Club and Outlaws Motorcycle Club.  This means

the defendant shall not pay dues, attend meetings,

participate in mandatory runs or wear the clothing,

1                           USA V. M. RONCONE

13:46:33  2  colors, patch or insignia of any such club.  Further,

13:46:36  3  the defendant shall not attend functions sponsored by

13:46:40  4  such clubs even if the function is open to citizens or

13:46:43  5  the club.

13:46:44  6              The defendant must remove all insignias or

13:46:46  7  emblems associating him with Rare Breed Motorcycle Club

13:46:50  8  and Outlaws Motorcycle Club from his home, motorcycle,

13:46:54  9  vehicles and other property.

13:46:56  10              In addition, page four of the order of

13:46:58  11  setting conditions of the release advises of the

13:47:01  12  penalties and sanctions of the foregoing conditions of

13:47:04  13  release.

13:47:04  14              Judge.  Would you like me to summarize the

13:47:06  15  violations?

13:47:07  16              THE COURT:  That would be helpful.  Thank

13:47:09  17  you.

13:47:09  18              PROBATION:  Thank you.  This states that a

13:47:11  19  violation of any of the foregoing conditions of release

13:47:15  20  may result in the immediate issuance of a warrant for

13:47:17  21  his or her arrest or revocation of release, an order of

13:47:20  22  detention and prosecution for contempt of court and

13:47:23  23  could result in a term of imprisonment, a fine or both.

13:47:26  24  The commission of a federal offense while on pretrial

13:47:29  25  release may result in the additional sentence of a term

                          USA V. M. RONCONE

13:47:32   2   of imprisonment which shall be in addition to any other

13:47:35   3   sentence.

13:47:36   4          It is also a crime to obstruct a criminal

13:47:39   5   investigation, tamper with a witness, victim or

13:47:42   6   informant, to retaliate or attempt to retaliate against

13:47:46   7   a witness, victim or informant or to intimidate or

13:47:51   8   attempt intimidate a victim, juror, informant or officer

13:47:55   9   of the court.

13:47:56  10          If after release, the defendant knowingly

13:47:58  11   fails to appear as required by the conditions of release

13:48:02  12   or to surrender for the service of sentence, he may be

13:48:06  13   prosecuted for failing to appear or surrender.  An

13:48:09  14   additional punishment may be imposed which shall be in

13:48:12  15   addition to the sentence for any other offense.

13:48:15  16          THE COURT:  Thank you, Officer Whitcomb.

13:48:17  17          First of all, Mr. Dell, any questions about

13:48:20  18   any of this?

13:48:20  19          MR. DELL:  No, your Honor.

13:48:21  20          THE COURT:  Mr. Roncone, can you confirm for

13:48:23  21   me on the record that you understand all of those terms

13:48:25  22   and conditions?

13:48:26  23          THE DEFENDANT:  I understand, your Honor.

13:48:28  24          THE COURT:  Do you have any questions for me

13:48:30  25   or Mr. Dell?

```
 1                    USA V. M. RONCONE
13:48:31   2          MR. DELL:  No, your Honor.
13:48:32   3          THE COURT:  Okay.  And James Roncone, any
13:48:35   4   questions that you have for me about any of these
13:48:38   5   conditions and your obligation as a third-party
13:48:42   6   custodian?
13:48:44   7          DEFENDANT'S FATHER:  No.
13:48:44   8          THE COURT:  Thank you.  So in terms of the
13:48:49   9   paperwork, I guess my question is about the property
13:48:52  10   that is being posted, are we able to take care of that
13:48:58  11   today or what is the situation in that regard?
13:49:01  12          MR. DELL:  I know that the U.S. Attorney's
13:49:03  13   Office has approved it.
13:49:08  14          THE COURT:  Is that correct?
13:49:08  15          MR. COOPER:  That is my understanding as
13:49:10  16   well, Judge, that is the e-mail we discussed earlier
13:49:12  17   from Ms. Reimen.  I don't know what the next steps are
13:49:17  18   involved in the office's approval; I'm not involved in
13:49:21  19   that.
13:49:21  20          THE COURT:  I guess I would like to have all
13:49:23  21   of the paperwork executed right now.  And there is an
13:49:28  22   appearance bond that we'll need to fill out as well that
13:49:32  23   will be secured by the property and it will have to be
13:49:36  24   secured by the cash, but we can fill out the paperwork.
13:49:39  25   And once that property is posted, then Mr. Roncone can
```

                              USA V. M. RONCONE

13:49:45  2  be released.  Right?

13:49:51  3              MR. DELL:  Sounds right.

13:49:53  4              PROBATION:  There is paperwork that the U.S.

13:49:56  5  Attorney's Office has to provide, as far as I know.  You

13:49:59  6  mentioned the e-mail, but I think there is some sort of

13:50:02  7  documentation that has to be provided that is

13:50:08  8  unencumbered or no liens.

13:50:09  9              MR. COOPER:  Sure.  And I can check with Mr.

13:50:11  10  Dell if the Court would indulge me.

13:50:14  11              THE COURT:  I can step off the bench and

13:50:16  12  maybe you can work on all of the paperwork and then I

13:50:20  13  can come back out and we can execute everything.

13:50:22  14              MR. COOPER:  That works, Judge.

13:50:24  15              PROBATION:  Okay.

13:50:25  16              THE COURT:  Thank you.

13:50:25  17              (Whereupon, there was a break in the

13:50:25  18  proceeding.)

14:39:09  19              THE COURT:  All right.  We are back on the

14:39:11  20  record.  Note the presence of all counsel.

14:39:13  21              Mr. Roncone, I understand that all of the

14:39:17  22  paperwork has been executed.  I have in front of me an

14:39:20  23  order setting conditions of release.  Mr. Roncone, you

14:39:24  24  can confirm that this is your signature here?

14:39:27  25              THE DEFENDANT:  Yes, your Honor.

                           USA V. M. RONCONE

14:39:28    2        THE COURT:  And James Roncone, you've signed

14:39:30    3  this as well?

14:39:32    4        DEFENDANT'S FATHER:  Yes, your Honor.

14:39:32    5        THE COURT:  All right.  And then I also have

14:39:34    6  the appearance bond with both the defendant's signature

14:39:40    7  and James Roncone's signature as well.  And we've

14:39:44    8  received e-mails from the U.S. Attorney's office with

14:39:47    9  the necessary paperwork and confirming that the property

14:39:54   10  is sufficient to secure the $100,000 and that the U.S.

14:40:01   11  Attorney's Office will file the necessary lien with

14:40:04   12  respect to it.

14:40:06   13        I think the, I guess, probation has also

14:40:09   14  confirmed that Mr. Roncone can be outfitted with the

14:40:12   15  electronic monitoring here at the courthouse and the

14:40:15   16  jail, he will be transported back to the jail and they

14:40:18   17  will not remove it.  Correct?

14:40:20   18        PROBATION:  That's correct, your Honor.

14:40:21   19        THE COURT:  And the plan is if the $100,000

14:40:24   20  in cash is posted today, that Mr. Roncone will be

14:40:27   21  released from the jail and probation would be able to do

14:40:32   22  a home visit tomorrow morning.

14:40:35   23        PROBATION:  That's correct, Judge.

14:40:36   24        THE COURT:  Okay.  And I guess we're not

14:40:38   25  clear on the $100,000 cash at this point.

USA V. M. RONCONE

14:40:42  MR. DELL:  We're trying to do that.  The other gentleman that was here is my client's cousin and he also is on the savings account and he just walked to M&T Bank and he is trying to get a bank check made out to the clerk.  He only has a couple of forms of I.D. and if they need three, he'll have to go back to Buffalo and do that.

THE COURT:  I'm going to sign the appearance bond and today is the?

MR. COOPER:  21st.

THE COURT:  And I'm also going to sign the order setting conditions of release.

Is that a thumbs up.

MR. DELL:  Yes.

THE COURT:  Good.  And I think, Dawn, you need to sign the appearance bond as well.

THE CLERK:  Thank you, Judge.  All right.  So I've executed the necessary paperwork and I think that takes care of everything.  Once the cash is posted, it will have to be posted with the clerk's office upstairs on the sixth floor.  And they'll need the paperwork and my courtroom deputy can help you with that once we conclude.

Anything else from the government?

1

14:42:18   2          MR. COOPER:  No, thank you, your Honor.

14:42:19   3          THE COURT:  Mr. Dell, anything else on

14:42:20   4   behalf the defendant?

14:42:21   5          MR. DELL:  No, your Honor.  Thank you.

14:42:22   6          THE COURT:  Anything else from probation?

14:42:24   7          PROBATION:  Nothing, Judge.  Thank you.

14:42:25   8          THE COURT:  Thank you very much, everybody.

9

10              *     *     *

11              CERTIFICATE OF REPORTER

12

13      I certify that the foregoing is a correct transcript

14   of the record of proceedings in the above-entitled

15   matter.

16

17   S/ Karen J. Clark,  RPR

18
     Official Court Reporter
19

20

21

22

23

24

25